**Judith H. KLINK, Appellant,**

**v.**

**RAMSEY COUNTY, by Charles ZACHA-RIAS, Sheriff, Ramsey County Sheriff's Department, Respondent.**

**No. C6–86–1229.**

Court of Appeals of Minnesota.

Dec. 16, 1986.

Review Denied Feb. 13, 1987.

Alf E. Sivertson, Michelle M. Barrette, Sivertson and Barrette, P.A., St. Paul, for appellant.

Thomas Foley, Ramsey Co. Atty., Kevin J. Short, Asst. Co. Atty., St. Paul, for respondent.

Heard, considered, and decided by POPOVICH, C.J., and WOZNIAK and FORSBERG, JJ.

## OPINION

WOZNIAK, Judge.

Judith Klink appeals a judgment of dismissal of her asserted claims of sexual harassment by seven members of the Ramsey County Sheriff's Department. Klink sought compensatory and punitive damages premised on unfair discrimination through sexual harassment in violation of the Minnesota Human Rights Act. We affirm.

## FACTS

Judith Klink was hired on September 2, 1969 as a clerk-typist by the Ramsey County Sheriff's Department. Until August 1983, she worked in the civil division located in downtown St. Paul.

In 1975 she was promoted to the position of deputy sheriff clerk-matron, which paid more than a clerk-typist and had the additional duty of transporting female prisoners. The department abolished the clerk-matron position and in 1977 she was returned to clerk-typist III. Klink was unhappy about this and filed a human rights complaint for severance pay which was dismissed. Klink remains bitter about this demotion.

Some time later, Klink protested the sheriff's policy prohibiting his employees from bidding at property foreclosure sales. She took legal action and obtained a ruling in her favor.

In August 1983, Klink voluntarily transferred to the Rice Street Patrol Station in Shoreview and was assigned duties as a records clerk on the 7:00 a.m. to 3:00 p.m. shift, Monday through Friday. Her principal work station was on the second floor of the building at a desk in an open area behind a public counter. This desk was shared by other clerks on other shifts. The second floor contains several offices, a radio room, squad room, and locker room. Klink's immediate supervisor was Gary Kollman who also supervised the radio dispatchers. Division Commander Fred Spencer was the top officer at the station. Next in hierarchy was Deputy Division Commander Stilwell Benjamin. Under him were several lieutenants, then sergeants, then patrol persons, then radio dispatchers and the records clerks.

Klink reported directly to Kollman, but did work for several of the other supervisors and nonsupervisory personnel at the station. Her general duties were to act as receptionist, answer telephones, assist the public at the counter, file, type, operate the computer, and deliver the United States and interoffice mail. As part of her duties, she went to other parts of the second floor.

When Klink arrived at the station, she was immediately disheartened by the vulgar language, dirty jokes, and apparent disorganization. During her third day on the job, she vomited all day. Klink, however, enjoyed the work and appeared to get along well with her co-employees and supervisors, and came to be on a first-name basis with everyone.

Klink objected to various station procedures and conduct of personnel. These objections, most of which she did not express until March and April 1985, fall into two categories—those not directly related to her sexual harassment allegations and those which are.

Illustrative of the first category, and where an immediate complaint was made, are the following:

1. Female employees were not given lunch and coffee breaks. She complained to the union and this was remedied.

2. She complained that Kollman took a trip but marked his time records as

working. Commander Spencer told her he was aware of the matter and that it was done with his permission under department policy to compensate supervisory personnel for overtime.

3. She objected to being docked for travel time when she was required to attend a telephone answering course.

Other examples, related as specific complaints in March and April 1985, included the following:

1. Sheriff appointed his unqualified friends who sat around and did nothing.

2. The men took 1½ hours for breakfast and then a long lunch.

3. Seventy percent of the people are chemically dependent and take two- to three-hour liquid lunches.

4. The relief clerk does needlepoint, knits, reads, and watches television, but indicates she has worked for eight hours.

5. The parking lot is not plowed in the winter and this is discriminatory against women.

6. There was no coffee room or ladies' lounge.

7. The men put hot coffee in the wastebaskets and dropped ashes on the floor to harass janitors.

8. Most of the men are so illiterate they cannot read or write.

9. The other clerks are abusive towards her.

10. A deputy left some spoiled meat in a pillow case for about an hour on the counter near her desk just to harass her. The evidence showed the meat was taken in a home burglary and the deputy left it on the counter briefly (while he answered a telephone call) so that the owner could come and identify it.

In the second category are complaints relating to sexual harassment allegations. No objection was made until March and April 1985, except for complaints about foul language.

Nearly everyone, male and female, at the patrol station used profanity; some used it regularly. Persons arrested also used profanity and it was a daily occurrence at the patrol station from August 1983 through March 1985. Deputy Commander Benjamin routinely used the word "f____," especially when chastising a subordinate and he had a loud voice. The persons who used vulgar language did not do so in the clerk's work area, did not direct it at Klink, did not use it in conversation with her or in reference to her. Most of the language was used in the offices, locker, or squad rooms where Klink would overhear it. One of the clerks, Melinda Anderson, used profanity in the clerk's area at the public counter and while talking on the telephone.

Klink specifically complained about Benjamin's language to Commander Spencer and Spencer told Benjamin not to use such language in Klink's presence. When she complained again, Spencer told her to document dates and times, but she did not provide any such document. Klink did complain about Anderson's language, but apparently no action was taken.

Examples of Klink's objections in the second category pertaining to sexual harassment, all of which were not expressed until March and April 1985, are:

1. Deputy Commander Benjamin changed his clothes in his office and on at least one occasion left the door ajar. At one time she saw him in his underwear and said, "Nice legs, Ben."

2. Deputy Commander Benjamin read "Playboy" and "Penthouse" magazines on his lunch hour in his office.

3. Commander Spencer brought to the station a "Penthouse" magazine that featured the dethroned Miss America, Vanessa Williams, and allowed some employees to look at it. He did not show it to Klink, openly display it or attempt to coerce anyone to look at it.

4. "Girlie" magazines were kept in the squad room sergeant's desk drawer.

5. Pin-ups of nude or partially nude women were inside locker doors of

some deputies which Klink could see if the door were open and she passed by.

6. A pin-up inside Sergeant Kennicutt's locker outside his office was observable to Klink from her desk when the door was opened.

7. One of the deputies, whose father is a printer, brought vulgar cartoon business cards and passed them around, although not to Klink. They were not shown to her, but were left on various desks and she would see them as she went through the office.

8. Memo pads with lewd or vulgar illustrations or statements were used. One said "A day without sex is like a day without sunshine"; another was entitled "Scratch Pad" and showed a hand scratching a buttock, and two others were labeled "Doodle Pad." One depicted a reclining male and the other a reclining female. The genitalia and the female breasts were not drawn in and were left blank. On one occasion Deputy Palacio instructed Klink to type something on the pad depicting the reclining female.

9. Lieutenant Roeser had on his shelf at the back of his office a coconut carved to resemble a monkey. It had a lid that could be pulled open from the front and inside was a replica of a penis. Roeser did not show this to any clerk or give anyone permission to look at it, but clerk Anderson took it from the office, opened the lid, and showed it to Klink.

10. Off-color jokes were told in areas where Klink could overhear them.

11. A coffee can used as an ashtray was labeled "butt can" which had photographs of clothed buttocks wrapped around it.

12. Three deputies were watching a pornographic movie on county time at the private residence of one of them while a robbery of a credit union was occurring. Actually, the evidence showed that a citizen complained that her 15–year-old son had rented "Debbie Does Dallas" from a video rental store and to determine if the rental violated the local ordinance, the city attorney advised Sergeant Kennicutt to view the tape. There was no video equipment at the station and since he knew Lieutenant Bergeron lived just a few minutes away and had a VCR, they, along with Deputy Commander Benjamin, went to view the movie. When they heard a radio dispatch about the robbery, they immediately responded by going to the credit union.

Klink was offended by the vulgarity and lewdness in the station. Other female employees were also upset and others were either amused or ignored the situation. Klink's psychologists describe her as having high moral standards; the defense psychiatrist describes her as "hypersensitive."

On July 23, 1984, Klink asked for a transfer, but it was denied because she gave no reason. She resubmitted her request on August 1, 1984 and gave as reasons unduly heavy workload, coffee break problems, difficulties with the relief clerk, dishonesty by her supervisor, and the poor examples her supervisor sets. She did not mention any other objections and this request was apparently denied.

From August 1983 to March 22, 1985, Klink did not complain about sexual harassment other than the language used by Deputy Commander Benjamin and Melinda Anderson. She testified that she did not complain because there was no one to complain to since the harassers were her bosses and that if her complaints were unheeded, her work situation would become intolerable and she could suffer from reprisals.

On March 21, 1985, Deputy Palacio asked Klink to type on the doodle pad depicting the reclining female. She told him such a request could constitute sexual harassment. Although the deputy felt she was joking, Commander Spencer perceived her to be sincerely upset when she described this incident in her daily log and gave a copy to her supervisor, Kollman, on March 22.

Kollman told Klink he would take care of the matter and discuss the incident with

Commander Spencer. He went downtown to consult the internal affairs office and notified the county attorney's office and an affirmative action representative. When he returned, he told Klink that he and the others were taking the matter seriously and gave her a grievance procedure handbook and told her to report any reprisals.

Also that day, the internal affairs officer informed Sheriff Charles Zacharias, and he and Zacharias went to the patrol station and met with Commander Spencer, Deputy Commander Benjamin, and Kollman. Zacharias ordered that all lewd memo pads and similar material be removed and Commander Spencer indicated that he had already done so.

On Monday, March 25, 1985, Klink presented a more detailed complaint that implicated seven male employees at the station, Spencer, Benjamin, Roeser, Kennicutt, Sergeant Dexter, and deputies Mike Shanley and Palacio. Kollman delivered the complaint to internal affairs and notified the county attorney's office and affirmative action. Sheriff Zacharias assigned Chief Deputy Tom Falvey and the affirmative action officer to the case.

Falvey called Commander Spencer and Deputy Commander Benjamin to his office. He warned them about foul language, directed them to remove any remaining sexual material, and ordered written reports. He also met with Roeser, Dexter, Kennicutt, and Shanley and ordered written reports and warned that any further inappropriate conduct would result in disciplinary action. Deputy Commander Benjamin wrote a roll call bulletin directing all personnel to stop using profanity. This was read three times a day for about two and one-half weeks and was also posted on the squad room bulletin board. Falvey also met with Deputy Palacio who was ordered to submit a written report. Palacio apologized in writing to Klink on March 26.

After reviewing Klink's complaint and the written responses from the seven men and after consulting with Falvey and the affirmative action officer, Sheriff Zacharias decided that conferences with the employees and oral reprimands, coupled with orders to cease the foul language and remove the materials, would constitute sufficient remedial action at this time.

On April 4, 1985, while Klink was on vacation, the affirmative action office met with all supervisors in the sheriff's department and reviewed established procedures for dealing with sexual harassment complaints. These procedures were adopted by the county in February 1984 and all supervisory personnel had attended a sexual harassment training course in November or December 1984.

While Klink was on vacation, someone placed a dead duck wrapped in a newspaper on Commander Spencer's desk. Around its neck was a note which said, "guilty of sexual harassment." The duck was quickly disposed of, although a few employees, including Melinda Anderson, observed the duck. Anderson informed Klink of the dead duck incident when she returned from vacation. In the downtown office, someone put a picture of Snow White and the Seven Dwarfs on the bulletin board and wrote Klink's name next to Snow White and the names of the seven employees next to the dwarfs' names. Klink viewed the duck matter as a reprisal and the Snow White matter as a show of support by a friend.

Klink heard a deputy singing "You'll Never Walk Alone" in her presence and was told that one of the clerks told a dispatcher there would be no smoking because of Klink and that "somebody ought to take a contract out on her. I know someone who would like to." Klink viewed these as reprisals.

Other matters viewed as reprisals were the following:

1. On March 28, 1985 Kollman issued a memo that all record clerks could not enter the squad room during shift changes and that morning mail would be delivered by Deputy Commander Benjamin, rather than Klink.

2. Deputy Commander Benjamin was told to do his own typing.

3. Someone removed her license tabs from her car.
4. One day she noticed a chalk-like washable substance on her car.
5. A black cat came to her door and she believed the cat was drugged and had been sent to her by the patrol station people.
6. She saw an unmarked patrol car drive through her alley.
7. During her first week of medical leave her telephone rang continuously.
8. In October 1985 a recording device was placed on the phone at the records clerk desk and all clerks were informed of this in writing.

In an April 15, 1985 meeting with the affirmative action officer, Klink said she was pleased with the rapid response to her complaint and she said the foul language had stopped. Later she said Deputy Benjamin used the word "f____" again and was generally using "son of a bitch." Klink filed suit on May 22, 1985 and had no further contact with affirmative action.

Klink alleged that the incidents caused her to have nightmares, become nervous and ill, to be depressed and paranoid, and to lose powers of concentration and memory. She had been on medical leave since February 1986 and claimed that she could not return to any job in law enforcement and needed to be retrained in accounting.

Klink began counseling with psychologists in late April 1985 and they diagnosed her condition as post-traumatic stress disorder of a permanent nature. The defense psychiatrist opined that her most probable diagnosis was not post-traumatic stress disorder, but instead was an adjustment disorder with anxiety and depression and with work and social functioning impairment.

Klink sought damages as follows: past medicals, $1,395; future medicals, $1,000; retraining costs and wage loss, $90,413; attorney's fees, $15,249; mental anguish and suffering, $60,000; punitive damages, $6,000; and treble damages.

The case was tried before the trial court and on June 3, 1986, the court ordered judgment of dismissal in favor of all defendants as to all claims asserted by Klink. Klink appeals.

## ISSUE

Did the trial court clearly err in determining that Ramsey County and its employees did not sexually harass Klink?

## ANALYSIS

We note initially that the trial court's detailed findings of fact were especially helpful to this court.

Minn.Stat. § 363.03, subd. 1(2)(c) (1984) provides that it is an unfair employment practice for an employer to discriminate against a person regarding hire, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment because of that person's gender. Sexual harassment can be a form of sexual discrimination. *Id.*, subd. 10; *Continental Can Company, Inc. v. State of Minnesota*, 297 N.W.2d 241 (Minn.1980). Sexual harassment is defined as including

> unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature when:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (3) that conduct or communication has the purpose or effect of substantially interfering with an individual's employment, \* \* \* or creating an intimidating, hostile, or offensive employment, \* \* \* and \* \* \*, the employer knows or should know of the existence of the harassment and fails to take timely and appropriate action.

Minn.Stat. § 363.01, subd. 10a (1984).

In addition, it is an unfair discriminatory practice for an employer to intentionally engage in reprisals because of an employee complaint of unfair discrimination. *Id.*, subd. 7. Reprisals include intimidation, retaliation, harassment, or departure from customary employment practice.

Klink alleged she was discriminated against through the creation of an offensive employment environment. She contended the working environment constituted harassment which the employer knew or should have known about, and failed to take timely or appropriate action, and then committed reprisals against her after she complained. Work environment harassment which creates an intimidating, hostile, or offensive work environment may be actionable. *Meritor Savings Bank, FSB v. Vinson*, —— U.S. ——, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). In such an environment, an employer creates or condones a workplace environment which significantly and adversely affects an employee because of her sex. *Henson v. City of Dundee*, 682 F.2d 897, 902 (11th Cir.1982). The trial court concluded that Ramsey County did not engage in sexual harassment.

On appeal, the trial court's findings will not be disturbed if they are reasonably supported by the evidence as a whole. *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 441 (Minn.1983). The trial court's decision will be reversed only when the result is clearly erroneous. *Id.* A trial court's findings are clearly erroneous when they are without substantial evidentiary support or induced by an erroneous view of the law. *Anda Construction Co. v. First Federal Savings and Loan Association, Duluth*, 349 N.W.2d 275, 277 (Minn.Ct.App.1984).

In the landmark *Continental Can* case, the supreme court stated:

> One of the purposes of the Act is to rid the workplace of disparate treatment of female employees merely because they are female. Differential treatment on the basis of sex is more readily recognizable when promotion or retention of employment is conditioned on dispensation of sexual favors. It is invidious, although less recognizable, when employment is conditioned either explicitly or impliedly on adapting to a workplace in which repeated unwelcome sexually derogatory remarks and sexually motivated physical contact are directed at an employee because she is a female. Repeated, unwarranted, and unwelcome verbal and physical conduct of a sexual nature, requests for sexual favors and sexually derogatory remarks clearly may impact on the conditions of employment. When sexual harassment is directed at female employees because of their womanhood, female employees are faced with a working environment different from the working environment faced by male employees.

*Continental Can*, 297 N.W.2d at 248 (footnote omitted).

The supreme court also stated that "[i]n our view, the Act *does not impose a duty on the employer to maintain a pristine working environment.*" *Id.* at 249 (emphasis added). In this regard, the trial court said: "The [supreme] court obviously recognized that we cannot by legislative or judicial fiat alter the effects of years of human conditioning. Certain attitudes, beliefs, language and conduct by some persons will often be offensive and objectionable to others."

Just before submission of the case, the respondent brought the case of *Sigurdson v. Isanti County*, 386 N.W.2d 715 (Minn. 1986), to the attention of the trial court. In *Sigurdson*, the supreme court held that in employment discrimination cases involving claims of disparate treatment and brought under the Minnesota Human Rights Act, the trial court must explicitly apply the *McDonnell-Douglas* analysis. *Id.* at 719–20; *see McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The *McDonnell-Douglas* test is a three-part analysis for adjudication of Title VII cases which consists of a prima facie case, an answer, and a rebuttal. *Sigurdson*, 386 N.W.2d at 720. The Minnesota Supreme Court has adhered to the principles developed under Title VII of the 1974 Civil Rights Act in construing provisions of the Minnesota Human Rights Act. *Hubbard*, 330 N.W.2d at 441; *Danz v. Jones*, 263 N.W.2d 395, 398–99 (Minn.1978).

■ In *McDonnell-Douglas*, the Supreme Court outlined a test for establishing a prima facie case of discrimination. *McDonnell-Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Although the Minnesota Supreme Court has not articulated a *McDonnell-Douglas* prima facie test for cases involving sexual harassment, we now so hold. Many jurisdictions have adopted the following test:

1. The employee belongs to a protected group.
2. The employee was subject to unwelcome sexual harassment.
3. The harassment complained of was based on sex.
4. The harassment complained of affected a "term, condition, or privilege" of employment.
5. Employer liable based on knowledge or imputed knowledge of the harassment and failure to take remedial action.

*Henson*, 682 F.2d at 903–05; *see Moylan v. Maries County*, 792 F.2d 746, 749 (8th Cir. 1986); *Katz v. Dole*, 709 F.2d 251, 255–56 (4th Cir.1983); *Cummings v. Walsh Construction Co.*, 561 F.Supp. 872, 877 (S.D. Ga.1983); *Coley v. Consolidated Rail Corp.*, 561 F.Supp. 645, 647 (E.D.Mich. 1982).

The trial court did not expressly state that appellant failed to prove a prima facie case. However, it did find that respondents did not sexually harass appellant and under a *McDonnell-Douglas* prima facie test, the plaintiff must prove a prima facie case of sexual harassment. The trial court did consider the relevant case law in determining whether sexual harassment occurred in this case.

■ The trial court indicated that the language and conduct must be examined by looking at the nature, frequency, intensity, location, context, duration, and object or target in determining its effects on disparate treatment of female workers. *See also Meritor*, —— U.S. ——, 106 S.Ct. 2399, 91 L.Ed.2d 49. We agree that these are appropriate factors to consider in this type of alleged harassment. In *Continental*

*Can*, the supreme court noted that all the circumstances must be examined to determine whether actionable sex discrimination exists. *Continental Can*, 297 N.W.2d at 249. If it is of such degree that it has a likely discriminatory effect, the employer must act promptly and appropriately to eliminate the discrimination.

The trial court found, and we agree, that the facts here are distinct from the facts in *Continental Can* and two subsequent cases, *McNabb v. Cub Foods*, 352 N.W.2d 378 (Minn.1984), and *Tretter v. Liquipak International, Inc.*, 356 N.W.2d 713 (Minn. Ct.App.1984). These three Minnesota cases deal directly with sexual harassment in the workplace. However, there are several important differences. First, the cases involved sexual touching, advances, statements, and derogatory remarks directed specifically at or to a particular female employee. Second, the employees in the cases expressly complained to managers or supervisors. Finally, the employer, after becoming aware of the sexual harassment, did nothing to remedy the situation.

Appellants apparently argue the trial court's decision may have been based on an erroneous view that the sexual harassment must be directed at the complainant. This is an oversimplified reading of the trial court's decision.

■ The trial court considered the nature and frequency and other circumstances surrounding the language and conduct. Foul language and vulgar behavior in the workplace does not automatically trigger an actionable claim of sex discrimination by a worker who finds such language and conduct offensive or repulsive. *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). The sexual harassment must be sufficiently severe or pervasive so as "to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor*, 106 S.Ct. at 2406 (quoting *Henson*, 682 F.2d at 904). Klink overheard foul language and inadvertently viewed objectionable materials on

a sporadic basis. The employees should have used better judgment by not keeping vulgar materials in a public building and they also should have been more circumspect as to their language.

■ Nevertheless, such carelessness and insensitivity is not tantamount to purposeful sexual harassment. In this case, the foul language was used in private offices and mostly in other rooms, and was not directed at Klink. The obscene materials were kept in offices, desk drawers or lockers, and Klink was not invited to possess or view the offensive items. This is not sufficiently severe or pervasive sexual harassment. Further, the employer cannot reasonably be charged with knowledge that Klink was being discriminated against through sexual harassment since it did not or could not know the environment was offensive to Klink. There was no realistic and reasonable way for the employer to know of the existence of sexual harassment unless Klink called it to the employer's attention.

In our society, we are at times going to overhear profanity, whether it is at a sporting event, grocery store, gas station, or on the job. Peace officers are going to utter certain epithets which may engender offensive feelings in some employees, but merely overhearing them is clearly not sufficient to state a claim for sexual harassment. Our supreme court held that there is no duty imposed upon an employer to maintain a pristine working environment.

We also agree with the trial court's observations that it is difficult to conclude that Klink refrained from complaining because there was no one to whom to complain or that she was afraid of reprisals. Her employment history contradicts that contention because she has demonstrated that she is not reluctant to complain about inequities, even to the point of taking legal action. When she did complain about the doodle pad depicting the female, the sheriff's department took swift and appropriate action.

The claimed "reprisals" were dismissed by the trial court as not in fact reprisals against Klink because of her assertion of her right to complain about sexual harassment. The trial court stated and we agree:

The dead duck incident did not in any way involve her; the singing of the song is at best ambiguous; the comment about a contract on her life involved a matter totally unrelated to the sexual harassment issue; the Snow White incident was treated by her as a sign of support for her; and the other items discussed in the facts raise some suspicions but do not rise to the level of competent proof of reprisals.

In addition, we note that the change in job duties concerning mail delivery can easily be seen as appropriate action in response to her claim since she was relieved of duties requiring her to go to an area she found offensive; similarly, making Deputy Benjamin do his own typing is hardly a reprisal against Klink. The recording device was placed on the telephone to record conversations of Anderson to document her use of foul language when talking to the public.

The trial court's evaluation of the sheriff's department's conduct as "mindless and careless locker room behavior" seems particularly apt. The trial court did not err in concluding that Klink failed to prove by a preponderance of the evidence that Ramsey County is liable for damages as a result of violations of the Minnesota Human Rights Act.

We hold that the evidence supports the finding that appellant did not prove that she was sexually harassed and thus failed to prove a prima facie case under the McDonnell-Douglas analysis. We need not address the remaining two steps of the McDonnell-Douglas test. See Bowen v. Superwood Corp., 395 N.W.2d 738 (Minn. Ct.App.1986).

## DECISION

An employer is not required to maintain a pristine working environment. Ramsey County Sheriff's Department employees

did not sexually harass Klink in maintaining an offensive work environment.

Affirmed.