Neil K. JOHNSON, Respondent,

v.

RAMSEY COUNTY, the State of Minnesota, Defendants,

Alberto O. Miera, Appellant.

No. C9–87–1638.

Court of Appeals of Minnesota.

June 7, 1988.
Review Denied Aug. 24, 1988.

Thomas Foley, Ramsey Co. Atty., Beth G. Sullivan, Michele Timmons, Asst. Ramsey Co. Attys., Hubert H. Humphrey, III, Atty. Gen., Jean Boler, Sp. Asst. Atty. Gen., St. Paul, for defendants.

John C. McNulty, Marcy S. Wallace, Charlotte M. Reed, McNulty & Wallace, St. Paul, for appellant.

Heard, considered and decided by PARKER, P.J., and FORSBERG and KALITOWSKI, JJ.

## OPINION

PARKER, Judge.

Neil Johnson brought a claim against Ramsey County and the State of Minnesota, alleging sexual harassment under the Minnesota Human Rights Act. He also brought an action against Judge Alberto Miera for battery and intentional infliction of emotional distress.

Miera moved for dismissal under Minn.R. Civ.P. 12.02(5) and for summary judgment. The trial court granted Miera partial summary judgment on the common law torts arising before November 6, 1984, ruling that the statute of limitations had run, and denied dismissal of the battery claim as barred by the Worker's Compensation Act. The trial court also granted Miera summary judgment on the intentional infliction of emotional distress claim, because the allegations did not satisfy the elements of the tort. Miera asserted a defamation counterclaim against Johnson.

The sexual harassment claim was tried to the court; the battery claim and defamation counterclaim were tried to the jury. The jury found that a battery had occurred and awarded $50,000 in compensatory damages for past injury, $25,000 for future injury over a two-year period, and $300,000 in punitive damages. It also found that the allegedly defamatory statements made by Johnson were true.

The trial court denied Miera's motions for *Schwartz* hearings, but ordered unconditional remittitur of punitive damages to $50,000 and dismissed the sexual harass-

Alf E. Sivertson, Michelle M. Barrette, Sivertson & Barrette, St. Paul, for respondent.

ment claim. Miera appealed and Johnson filed a notice of review. We affirm.

## FACTS

Judge Alberto Miera hired Neil Johnson as his court reporter. Two terms of employment are involved in this case: the first covered ten months, from March 10, 1984, to January 11, 1985, and the second spanned 13 months, from September 16, 1985, to October 15, 1986.

Both men admitted to a friendship during the first several months of Johnson's employment. They played racquetball together and lunched frequently. Johnson was often a dinner guest in the Miera home.

Miera told Johnson that he was bisexual; Johnson reacted with sympathy, but this marked a change in their relationship. Twice afterward, Miera showed up at Johnson's apartment unannounced and asked to spend the night because of marital difficulties. Each time, Johnson gave Miera his bedroom and slept on the living room floor. According to Johnson's testimony, on both occasions Miera came out of the bedroom, lay down next to him and began to touch him. Johnson reacted with shock and anger to each incident, and each time Miera retreated to the bedroom.

In June 1984 Johnson told Kathleen Conlee, a friend who worked as a court reporter for Judge Joanne Smith, that Miera was bisexual and had made advances toward him. Conlee in turn confided this to Judge Smith and continued to do so throughout both of Johnson's employment terms. Judge Smith testified that Conlee spoke privately with her on a regular basis about the matter.

On July 26, 1984, Miera called Johnson at home and said he was contemplating suicide. Johnson testified that he hurried to Miera's house; upon his arrival, Miera attempted to unbuckle Johnson's jeans. Johnson pushed him away and Miera asked why he came if he were not going to help.

According to Johnson, Miera attempted to get in his wife's car, saying not to worry; it would look like an accident. Johnson stayed throughout the night, and Miera alternately threatened to kill himself and begged for sex, closeness and understanding. By morning Miera called his mother in New Mexico, and she later testified that he was suicidal at that time.

Johnson claims that Miera called him twice the following morning, begging him to go away with him on his motorcycle and work things out together. Johnson called a friend, Paula Berg, another court reporter, and met with her that morning. He related the events of the previous night and told her that he believed the suicide threat was genuine. A short time later Johnson confided substantially the same set of events to Conlee and to Ellen Seesel.

Miera admitted that the suicide incident happened, although his recollection of events that night was hazy. He denied any sexual overtures.

After the incident, the relationship between Miera and Johnson was noticeably cooler. Johnson claimed that Miera engaged him in long conversations in his chambers and called him at home at least weekly. The telephone calls were verified by Conlee, with whom Johnson stayed during August. She answered Miera's calls and testified that Johnson was disgusted and asked her to say that he was not home.

Conlee testified that Miera asked personal questions about her and Johnson, such as why they were just good friends and not romantically involved. In November 1984 the judge dropped by unannounced at Conlee's home and talked to her about how Johnson was not working out at the court.

In September 1984 Miera telephoned Seesel, with whom Johnson had been romantically involved, and asked personal questions about her relationship to Johnson, such as whether they planned to date.

In September 1984 Johnson moved in with Ray Farrell and told him of Miera's sexual advances. Farrell answered four to seven calls from Miera and observed that Johnson was very upset on the phone, telling Miera to leave him alone.

In the fall of 1984 Miera voiced specific criticisms of Johnson to several people, including Mary Drews, his law clerk, and

Judge Kevin Burke. However, in discussing job performance with Johnson, Miera used vague terms, such as "our problem" and "comfort level." The exact meaning of these phrases is unclear; Johnson construed them to be sexual offers.

In mid-December 1984, in chambers with Miera, Johnson said he just wanted to do his job and did not want to clash any more. Miera got up from his desk, walked past Johnson, turned abruptly, kissed him on the lips and said, "Oh, we clashed!" Johnson then quit, leaving on January 11, 1985.

Miera did not hire a permanent replacement court reporter and called Johnson to let him know that the job was being held open for him. In June 1985 Johnson met with Miera, who said he had straightened out his life and assured Johnson that their relationship would be strictly business. Johnson agreed to return to the job.

Miera explained that he extended the offer out of a combination of guilt and gratitude. He testified that he felt guilt knowing he may have erred in his management of Johnson and gratitude because Johnson may have helped to save his life.

On September 16, 1985, Johnson returned to work. Initially, their working relationship was cordial and businesslike, but within a few months it disintegrated. Miera began to tell others about the problems he was having with Johnson. He complained that Johnson was late, unavailable when needed, took no initiative, and conveyed a negative attitude toward work. He told this to Judge Beryl Nord, Judge Burke and various attorneys and co-workers. Johnson's insolence was observed by a variety of people who testified that he was openly disrespectful of Miera and that he would roll his eyes and act exasperated before attorneys and court personnel.

In February 1986 Miera learned that Johnson was doing freelance work on a day when he had called in sick. Miera claims he confronted Johnson and attempted to set regular hours and that Johnson reacted with profanity and refused to comply.

Except for a two-day occasion, Johnson paid those who substituted for him when he freelanced; however, his freelance work increased through the summer and fall of 1986. Johnson scheduled five to eight private depositions a month, some of which lasted all day. Records show that Johnson should have been on call when some of the depositions occurred. There is no written policy prohibiting such work, and Miera admitted allowing it initially.

Both men admitted that their working relationship was strained and their interaction minimal. Johnson admitted that during the second employment period Miera never explicitly propositioned him or touched him, although a co-worker, Lisa Micalaff, interpreted Miera's behavior on one occasion as "flirtatious." One week before the end of Johnson's second term of employment, Miera invited him to go to New Mexico on a hunting trip. Miera claimed that he extended the offer as a gesture of friendliness, fully expecting Johnson to decline, which he did.

On October 15, 1986, Miera called Johnson into his chambers and told him that he had to leave by December. Johnson walked off the job immediately and told the clerk of court that he had been fired.

In his claim against the state, Johnson alleged that he was subject to two types of discrimination. He claimed that Miera sexually harassed him and that he was discharged for failing to respond to Miera's sexual advances.

Miera appeals, claiming that the $375,000 total damages awarded by the jury are the result of passion and prejudice. Johnson filed a notice of review, claiming no remittitur should have been granted reducing the punitive and compensatory award to a total of $125,000, and requests review of the sexual harassment claim. The state and Ramsey County each argue that it was not Johnson's employer for purposes of the Human Rights action.

## ISSUES

1. Was the evidence sufficient to support the jury's verdict on liability and damages for battery?

2. Did the Worker's Compensation Act bar the battery claim?

3. Did the trial court correctly deny Miera's motions for *Schwartz* hearings?

4. Did the trial court abuse its discretion in excluding the testimony of three unlisted witnesses?

5. Did the trial court err in ordering a remittitur of the punitive damage award?

6. Did the trial court correctly find that there were no incidents of sexual harassment within 300 days of the statute of limitations?

## DISCUSSION

### I

The trial court's findings should not be disturbed on appeal if they are reasonably supported by the evidence as a whole. *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 441 (Minn.1983). The trial court's decision will be reversed only if the result is clearly erroneous. *See id.* A trial court's findings are clearly erroneous if they are without substantial evidentiary support or are induced by an erroneous view of the law. *Anda Construction Co. v. First Federal Savings & Loan Association, Duluth*, 349 N.W.2d 275, 277 (Minn.Ct.App.1984), *pet. for rev. denied* (Minn. Sept. 5, 1984).

This court must take the view of the evidence which is most favorable to the trial court's findings. *Caroga Realty Co. v. Tapper*, 274 Minn. 164, 169, 143 N.W.2d 215, 220 (1966). Those findings should not be disturbed unless they are "manifestly and palpably contrary to the evidence." *Id.* at 170, 143 N.W.2d at 220. In particular, this court should not reverse findings having evidentiary support even though it might have found differently had it determined them in the first instance. *Id.* at 169–70, 143 N.W.2d at 220.

■ Credibility of witnesses and the weight to be given their testimony is a jury determination. *Sauber v. Northland Insurance Co.*, 251 Minn. 237, 249, 87 N.W.2d 591, 600 (1958). The jury found Miera liable for battery based on the unequivocal evidence that Miera kissed Johnson. Johnson's testimony was corroborated by his confidants Berg, Conlee and Seesel, each of whom testified that he related the events surrounding the kiss in contemporaneous conversation.

The jury found that from December 1984 through March 1987 Johnson had suffered emotional distress and embarrassment as a result of the kiss and that the distress would continue until March 1989. It awarded $50,000 in compensatory damages for past injury and $25,000 for future injury, totaling $75,000.

Miera suggests that a large compensatory damage award is proper only when the distress satisfies the strict standard for the tort of intentional infliction of emotional distress, *see Hubbard*, 330 N.W.2d 428, and when it is supported by objective injuries. However, the jury's award was based on the battery and not on intentional infliction of emotional distress. The tort of battery is a separate and distinct cause of action from the tort of intentional infliction of emotional distress, and the elements of proof necessary to sustain each claim are entirely different. *Compare Smith v. Hubbard*, 253 Minn. 215, 225, 91 N.W.2d 756, 764 (1958) (allowing compensatory damages for humiliation and mental suffering resulting from a battery), and *Smith v. Salem*, 150 Minn. 418, 419, 185 N.W. 394, 394 (1921) (allowing substantial compensatory damages for humiliation and disgrace resulting from physical injuries) *with Hubbard*, 330 N.W.2d at 439 (disallowing damages for emotional distress when there was no battery and insufficient evidence of "the actual occurrence of severe emotional distress").

■ Once a battery has been proved, compensatory damages may be awarded for humiliation and mental suffering. *See Smith v. Hubbard*, 253 Minn. 215, 225, 91 N.W.2d 756, 764 (1958). Johnson's resulting emotional distress was documented throughout the trial. He testified that the kiss made him feel sick and upset him so much that he related the incident to several friends.

■ The jury's award reflects their assessment of his suffering, pursuant to Minn.Stat. § 546.22 (1986). Just as the de-

termination of credibility is a function of the jury, so too is the determination of damages. The amount of damages sustained by a tort plaintiff is a fact question for the jury. *See Koehler v. Kline*, 290 Minn. 485, 487, 185 N.W.2d 539, 541 (1971).

Miera argues that there is no corroborated evidence of emotional distress resulting from the battery. However, Johnson's confidants testified that he was very upset by the occurrence, and a psychologist who is an expert on victims of sexual harassment assessed Johnson after the incident. She offered evidence of the emotional and psychological trauma which can result from such an incident and testified that Johnson had suffered such effects. The jury considered this testimony and apparently believed the witnesses. We hold that the evidence was sufficient to support the jury's verdict on liability and damages for battery.

## II

■ Miera asserts that Johnson's battery claim was barred by the Worker's Compensation Act, Minn.Stat. § 176.021, subd. 1 (1986), under which an employer is required "to pay compensation in every case of personal injury * * * of an employee arising out of and in the course of employment." This statute makes worker's compensation the exclusive remedy for most such injuries. *See* Minn.Stat. § 176.031 (1986); *Parker v. Tharp*, 409 N.W.2d 915, 917–18 (Minn.Ct.App.1987). Personal injury is defined as "injury arising out of and in the course of employment." Minn.Stat. § 176.011, subd. 16 (1986). It does not include

> an injury caused by the act of a third person or *fellow employee intended to injure the employee because of personal reasons*, and not directed against the employee as an employee, or because of the employment.

*Id.* (emphasis added).

In *Parker v. Tharp* a worker sued an employer for damages resulting from an assault by a co-worker at the workplace and during work hours. This court determined that the deliberate-intent exception

did not apply. *See id.* at 917. The fundamental question was whether the claimant was injured, not merely while he was at his employment, but " 'because he was at [his] employment, in touch with associations and conditions inseparable from it.' " *Id.* at 917 (citation omitted).

Johnson was at work when Miera kissed him; however, the kiss had no association with the job itself. Therefore, the exception does not apply, and the claim is not barred.

## III

Miera twice moved for *Schwartz* hearings and his motions were both denied. The decision whether to grant a *Schwartz* hearing is generally left to the discretion of the trial court. *State v. Mings*, 289 N.W.2d 497, 498 (Minn.1980). To establish a prima facie case for a *Schwartz* hearing, the movant "must submit sufficient evidence which, standing alone and unchallenged, would warrant the conclusion of jury misconduct." *State v. Larson*, 281 N.W.2d 481, 484 (Minn.), *cert. denied*, 444 U.S. 973, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979).

The jury rendered its verdict on March 25, 1987. On May 1, 1987, Miera first moved for a new trial, alleging jury misconduct. An unnamed person claimed that on March 19, 1987, Gerald Rohl, the jury foreperson, was seen reading a Minneapolis newspaper and heard conversing about the trial. It is alleged that this newspaper contained an account of the trial and that in response to an inquiry Rohl replied, "as a matter of fact the defense is kind of boring." Miera's attorney learned of this on March 30, 1987; however, he did not move for a *Schwartz* hearing until over a month later, on May 1, 1987.

■ An attorney for a losing party must notify the trial court immediately when the first suspicion of jury misconduct arises. *Zimmerman v. Witte Transportation Co.*, 259 N.W.2d 260, 262 (Minn.1977). If this procedure is not followed, the issue of jury misconduct may not be raised for the first time in a motion for a new trial. *Id.*

Therefore, this motion was clearly untimely and properly denied on that basis alone.

The trial court also found that Miera failed to establish a prima facie case of jury misconduct. Jurors were allowed to read newspapers, but warned not to read trial coverage. The informant had no way of knowing what the juror was reading. Rohl's comment indicates a normal reaction to the tedium of a lengthy trial. We affirm the trial court's conclusion that neither his comment nor the newspaper incident constituted such clear evidence of jury misconduct as to require a *Schwartz* hearing.

On June 16, 1987, the trial court considered Miera's second motion for a *Schwartz* hearing. He alleged jury misconduct based on statements made by two jurors on a radio talk show on April 11, 1987. Miera contends the jurors revealed that they improperly considered evidence not in the record when computing damages.

A careful reading of the entire radio show transcript shows that the show's host, an attorney, apparently misunderstood what was to be determined by the court and what was to be determined by the jury. Given the confusion on the part of the person leading the discussion, it would be virtually impossible to establish whether the jurors misperceived anything. The trial court noted that the two jurors "did a good job of explaining the verdict under difficult circumstances."

Some of the jurors' statements are ambiguous and reflect their mental process in arriving at a verdict; however, indications of misunderstood jury instructions or evidence cannot be used to impeach the jury's verdict. *Nebben v. Kosmalski*, 307 Minn. 211, 217–18, 239 N.W.2d 234, 238 (1976). It was well within the trial court's discretion to deny the second motion.

## IV

Miera also claims the trial court abused its discretion in excluding the testimony of three fact witnesses not on his witness list. He contends he was preju-

diced by the exclusion of the evidence and therefore should be granted a new trial.

Originally Miera submitted a list of 14 witnesses. At Miera's request, the trial court granted a one-week continuance. Forty-eight additional witnesses were then listed and allowed. Miera later sought to add the three in question.

The decision to allow testimony of witnesses omitted from a party's witness list will not be reversed absent an abuse of discretion. *See Cook Seed Co. v. Welker*, 288 Minn. 412, 415, 181 N.W.2d 870, 873 (1970). The record must be viewed most favorably toward sustaining the trial court's ruling. *See Kielsa v. St. John's Lutheran Hospital Association*, 287 Minn. 187, 192, 177 N.W.2d 420, 423 (1970). The burden of showing abuse of discretion lies with an appellant. *See id.* at 193, 177 N.W.2d at 424.

An attendant in the men's locker room of the St. Paul Athletic Club would have testified that he had seen no sexual advances when Johnson was at the club with Miera. Several other men had already presented this same testimony. Such evidence was cumulative and therefore its exclusion was not prejudicial. *Hornof v. Klee*, 259 Minn. 139, 144, 106 N.W.2d 448, 452 (1960). A teacher would have testified that Miera took an ethics course from him. This testimony could have been excludable as irrelevant. *See* Minn.R.Evid. 402. A third person would have testified about Johnson's job performance. This evidence was also cumulative. The exclusion of these witnesses does not warrant a new trial.

## V

The jury awarded Johnson $300,000 in punitive damages, but the trial court, on its own motion, reduced the award to $50,000. The trial court did not find that the award was the result of passion and prejudice. Instead, it found that the award was induced by lack of information about Miera's ability to pay.

Punitive damages are monetary penalties in excess of the compensation necessary to make a plaintiff whole. The two primary purposes of punitive damages are to punish

defendants and to deter others from similar conduct. *Melina v. Chaplin,* 327 N.W.2d 19, 20 n. 1 (Minn.1982).

The imposition of punitive damages resembles the imposition of criminal sanctions. Haugen & Tarkow, *Punitive Damages in Minnesota: The Common Law and Developments Under Section 549.20 of the Minnesota Statutes,* 11 William Mitchell L.Rev. 353, 357 (1985). Our supreme court has likened a punitive damage award to the imposition of a fine, requiring the defendant to have a guilty intention. *Id.; see Schmidt v. Minor,* 150 Minn. 236, 239–40, 184 N.W. 964, 965–66 (1921). It has also demanded that trial judges closely control the imposition and assessment of punitive damages. *Eisert v. Greenberg Roofing & Sheet Metal Co.,* 314 N.W.2d 226, 229 (Minn.1982).

The jury was provided no specific information on Miera's financial condition. Ability to pay is one of the factors the jury *shall* consider in assessing punitive damages under Minn.Stat. § 549.20, subd. 3 (1986):

> Any award of punitive damages shall be measured by those factors which justly bear upon the purpose of punitive damages, including * * * the financial condition of the defendant.

The jury had information only on Miera's work history and background. Miera objected to submitting punitive damages to the jury with the record "absolutely silent" on income or net worth. The court took judicial notice of the fact that his salary was $65,437, *after* both sides had rested.

In *Melina v. Chaplin* the supreme court affirmed the trial court's denial of a new trial or remittitur. Chaplin, a police officer, assaulted and battered Melina during an arrest. *Id.* at 20. The jury awarded $2,000 in compensatory damages and $35,-000 in punitive damages. No testimony was offered during the trial or in post-trial motions on Chaplin's ability to pay. *Id.* The supreme court stated:

> In reviewing an order of the trial court, we are confined to an examination of the record to ascertain whether there is evidence to sustain the judge's action.

*Id.* Absent any evidence of ability to pay, the award was undisturbed.

Johnson argues that a footnote in that case indicates that it is the defendant's responsibility to establish inability to pay.

> Some members of this court question whether the punitive damage award here was excessive. Had there been any evidence furnished to the jury or the court reflecting on Chaplin's lack of ability to pay, we might well have remanded for a new trial or remittitur.

*Id.* at 20 n. 1.

It seems doubtful to us that the supreme court intended by this footnote to shift to the defendant the burden of proof of ability to pay. However, it is not necessary for us to reach this question. In this case, unlike in *Melina,* on the motion for remittitur the trial court *had* evidence of Miera's ability to pay by judicial notice of his salary.

The trial court relied on *Bredberg v. Long,* 778 F.2d 1285, 1290 (8th Cir.1985), in which the Eighth Circuit Court of Appeals set aside punitive damages against two individuals even though there was no evidence presented on ability to pay. There, members of a religious community brought a fraud action against a corporation and the two individuals who operated the corporation. The $750,000 punitive damage award against the corporation was upheld; however, the $850,000 fraud award against the two individuals was set aside. That court said:

> Punitive-damage awards must not exceed the level necessary properly to punish and deter. As we recently stated * * * "[W]e can see neither the justice nor sense in affirming a verdict which cannot possibly be satisfied. The purpose of punitive damages is to punish [the wrongdoer] for outrageous conduct, not to drain him of his life's blood."

*Id.* at 1290 (citations omitted).

The trial court here specifically said:

> The court does not believe that the jury's award of punitive damages was a result of passion and prejudice, but rather was the result of their having no information about his financial condition except the

fact that he is a district court judge and prior to that he was an attorney at law. On that basis the court found that the damages were "beyond what was necessary to punish and deter."

■■■ Miera alleges that the jury's award was the result of passion and prejudice resulting from his judgeship, his bisexuality and public fear of Acquired Immune Deficiency Syndrome (AIDS). Based on our review of the record, these claims appear to be based on pure conjecture and speculation. We believe the trial court was acting well within its discretion by scrutinizing the award and ordering a remittitur of the damages based on ability to pay.

## VI

■■■ Johnson alleged two types of discrimination. He claimed that Miera sexually harassed him within the meaning of Minn.Stat. § 363.01, subd. 10a(3) (1986) and thus created a hostile work environment. This claim required Johnson to prove that he was subjected to sexual harassment sufficiently pervasive so that it altered the terms and conditions of his employment. *See Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982). He also claimed he was discharged for failing to respond to Miera's sexual advances. *See id.* at 907. The trial court found the evidence did not support these claims.

Johnson's allegations state a claim of disparate treatment based on gender. Disparate-treatment analysis "consists of a prima facie case, an answer, and a rebuttal." *Sigurdson v. Isanti County,* 386 N.W.2d 715, 720 (Minn.1986) (relying on *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). In such a case, first, "the plaintiff must present a prima facie case of discrimination by a preponderance of the evidence." *Id.* If the plaintiff is successful in establishing a prima facie case, the second step

creates a presumption that the employer unlawfully discriminated against the employee, and the burden of production shifts to the employer to present evidence of some legitimate, non-discriminatory reason for its actions.

*Id.* Finally, if the employer succeeds in carrying its burden of production, the third step

requires the plaintiff, in order to prevail, to show that the reason or justification stated by the employer is actually a pretext for discrimination.

*Id.*

In *Klink v. Ramsey County,* 397 N.W.2d 894, 901 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. Feb. 13, 1987), this court adopted a test for establishing a prima facie case of sexual harassment, modeled after the test for establishing a prima facie case of sex discrimination articulated in *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824:

1. The employee belongs to a protected group.
2. The employee was subject to unwelcome sexual harassment.
3. The harassment complained of was based on sex.
4. The harassment complained of affected a "term, condition, or privilege" of employment.
5. Employer liable based on knowledge or imputed knowledge of the harassment and failure to take remedial action.

*Id.* at 901. Sexual harassment is defined under the Minnesota Human Rights Act as including

unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature when:

\* \* \* \* \* \*

(3) that conduct or communication has the purpose or effect of substantially interfering with an individual's employment \* \* \* or creating an intimidating, hostile, or offensive employment \* \* \* and \* \* \* the employer knows or should know of the harassment and fails to take timely and appropriate action.

Minn.Stat. § 363.01, subd. 10a (1986).

In examining a sexual harassment claim, the trial court must examine the totality of

the circumstances, including the nature of the incidents and the context in which they occurred. *Continental Can Co. v. State*, 297 N.W.2d 241, 249 (Minn.1980). In *Klink*, 397 N.W.2d at 901, this court stated that "the nature, frequency, intensity, location, context, duration and object or target" of the language and conduct are appropriate factors to determine if such language and conduct amount to actionable sexual harassment.

The trial court's conclusions of law stated that all the elements for a prima facie case of sexual harassment had been met. The court held that Johnson had established a prima facie case of constructive discharge for sexual harassment based on the totality of circumstances, including incidents occurring during the first term of employment, which fell outside the 300–day statutory period. *See* Minn.Stat. § 363.06, subd. 3 (1986) (unfair discriminatory practice claim must be brought within 300 days after the occurrence of the practice). However, the trial court also held that the state had met its burden of production by articulating a legitimate, non-discriminatory reason for Johnson's discharge and that Johnson had failed to prove that an incident of sexual harassment had occurred within the 300–day statutory period. The court held that Johnson had specifically failed to prove:

   a. That Miera's conduct after the Statute of Limitations period commenced on January 9, 1986, meets the legal definition of sexual harassment;

   b. That Miera's conduct toward him after January 9, 1986, was motivated by Johnson's sex; and

   c. That Miera's conduct after January 9, 1986, created a hostile work environment due to sex discrimination.

Many people testified that during the second term of employment, the interaction between the two men was initially professional and then became cold, strained and openly hostile. Johnson was insolent to Miera in front of other court personnel. He twice called in sick when he was really freelancing and was freelancing when he should have been on call. Johnson argued

that his well-documented, disrespectful behavior was a legitimate reaction to the harassment he began to experience again. However, Johnson admitted that during the second term of employment Miera never touched him or made explicit advances to him.

Johnson cited many incidents in which Miera discussed with him the office "comfort level" and "our problems." He claimed that Miera was standing too close to him and looking at him in various flirtatious ways. The court considered the testimony of Miera's expert psychological witness when examining Johnson's subjective interpretation of Miera's behavior. The court decided that Johnson's observations represented his perceptions and were not convincing evidence. The court stated that Johnson misconstrued Miera's behavior, such as standing too close and various looks, "as containing sexual innuendo despite the lack of any explicit sexual content" and attributed this to the two men's cultural differences.

A sexual harassment case can, as may an employment discrimination case, turn on conflicting viewpoints. The Minnesota Supreme Court has stated:

> Employment discrimination cases often involve intricate factual issues in which only the trial court, with its opportunity to observe the witnesses first hand, can meaningfully assess the weight and credibility of the evidence. We have traditionally accorded great deference to the trial court in making findings of fact, recognizing that much must necessarily be left to its sound judgment and discretion because it has the advantages of fully hearing the testimony and acquiring a thorough familiarity with all the circumstances of the case. *An appellate court cannot judge the credibility of a witness or the weight, if any, to be given to testimony.*

*Sigurdson*, 386 N.W.2d at 721 (citation omitted; emphasis added). The weight and credibility to be assigned to Johnson's perceptions were within the trial court's domain as finder of fact. The trial court concluded that Johnson's apprehension of

Miera's motives colored his perceptions of events and he consequently attributed sexual designs to innocent behavior.

Johnson argues that the continuing-violation theory applies to these facts. Such a theory permits a plaintiff to seek redress for unlawful discriminatory acts which took place in a period barred by the statute of limitations if related to acts which occurred within the 300–day period. To invoke the continuing-violation theory, Johnson must show a violation of the Human Rights Act within the statutory period. *See Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 979 (5th Cir.1983). The trial court concluded that because no sexual harassment occurred during the 300–day period, Johnson's claim was barred.

The trial court held that Johnson could not employ the continuing-violation theory to resurrect a claim of discrimination concluded in the past, even though its effect persisted. *See United Airlines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). In *Evans* a flight attendant was forced to leave her employment due to a no-marriage rule in the airline. *Id.* at 554, 97 S.Ct. at 1887. Four years later, after the policy had been abolished, she was rehired. *Id.* In determining her seniority, the airline did not credit her earlier employment; therefore, she brought a civil complaint alleging a continuing violation of the no-marriage policy. *Id.* The court acknowledged that the seniority system gave present effect to a past act of discrimination, but said that continuing impact could not be the focus. *Id.* at 558, 97 S.Ct. at 1889. Rather, "the critical question is whether any present *violation* exists." *Id.* (emphasis in original).

We are respectful of the trial court's careful analysis in examining questioned behavior during the second term of employment. Johnson's complaints were organized into four categories: (1) conversations about the work situation; (2) "mind games" that Miera allegedly played with him; (3) Miera's mannerisms, which Johnson interpreted as flirtatious; and (4) overtures by Miera, such as a visit to Johnson's house and a hunting trip invitation. The trial court concluded that none of these actions, taken alone or together, constituted sexual harassment. Therefore, the continuing-violation theory cannot be applied. The prima facie case stands rebutted by the evidence of Johnson's poor work habits and his disrespectful, hostile attitude.

Johnson did not meet his ultimate burden of proving that the state's proffered reason for discharge was not credible or that the claimed discriminatory reason was the more likely reason for discharge.

The state and Ramsey County each argued that the other was Johnson's employer for purposes of the Human Rights Act. Because we affirm the trial court's finding that there was no sexual harassment, it is unnecessary for us to address that issue.

## DECISION

Affirmed.

FORSBERG, J., concurs specially.

FORSBERG, Judge (concurring specially):

I concur in the decision. I would, however, hold that it is the plaintiff's burden to show ability to pay since it is an element of proof of punitive damages. A judicial salary is only some evidence of ability to pay.