**Cheryl GIULIANI, Respondent,**

v.

**STUART CORPORATION, Appellant.**

**No. C3–93–1479.**

Court of Appeals of Minnesota.

March 1, 1994.

---

David W. McKenna, Lateesa T. Agunbiade, Robins, Kaplan Miller & Ciresi, Minneapolis, for appellant.

Alf E. Sivertson, Michelle M. Barrette, Sivertson & Barrette, P.A., St. Paul, for respondent.

Considered and decided by AMUNDSON, P.J., and PARKER and SCHUMACHER, JJ.

## OPINION

PARKER, Judge.

In this sexual harassment action brought under the Minnesota Human Rights Act, Minn.Stat. §§ 363.01–.15 (1990), Stuart Corporation appeals from a judgment for plaintiff Cheryl Giuliani, alleging that her claims were barred, forfeited, or waived; that the trial court's findings were clearly erroneous; and that the award of attorney fees was excessive. Stuart Corp. also challenges the civil penalty awarded the State of Minnesota. We affirm.

## FACTS

Cheryl Giuliani managed an apartment complex for Stuart Corporation, a real estate management firm owned and operated by Stuart Nolan. Thomas Backstrom was Giuliani's direct supervisor and a vice president at Stuart Corp. He encouraged her ambition to become a property manager responsible for overseeing several apartment complexes. When Stuart Corp. lost its contract to manage the property to which Giuliani was assigned, Backstrom arranged for her to assume duties in the main office.

Several months later, on two different occasions, Backstrom suggested to Giuliani that they have an extramarital affair. The first of these incidents occurred at Stuart Corp.'s main office. After a business discussion with Giuliani in his office, Backstrom closed the door and professed his attraction to Giuliani and a desire to have an affair with her. He mentioned his unhappiness with his marriage. Giuliani at first laughed at Backstrom's proposition, but then, feeling uncomfortable and confused, told him that she was happy in her marriage and did not wish to have an affair.

A few weeks later, Giuliani attended a business lunch with Backstrom at a hotel.

She was surprised to find the lunch reservations listed under the name "Thomas." After discussion of business, Backstrom again broached his proposition. He presented her with a greeting card on which he had written the message that he had booked a room at the hotel for the two of them. He had also written a series of options for her to consider and choose. These options were (1) yes, she wanted to have an affair; (2) "No, not today. I'm too nervous;" and (3) no. Giuliani marked the third of these and returned the card. Backstrom made reference to his intelligence in asking for the card back, remarking that there would be no proof that he had made the proposition. As she was leaving, he further remarked, "I don't take rejection well." Giuliani sat for a while in her car, troubled by these events. She felt that Backstrom's final remark to her was meant as a threat.

In the months following these encounters, Giuliani experienced a downturn in her career prospects within the company. Backstrom assigned a new direct supervisor to her. This supervisor, Elaine Swenson, would not recommend Giuliani for a promotion to property manager, concluding that she did not possess the polish for such a position.

Also during this time, Giuliani was designated to organize a party to be given by Stuart Corp. for employees of apartment guides and referral services. She was surprised not to receive an invitation to the party. When questioned, Backstrom responded that he had to "draw the line" somewhere.

Giuliani and her husband eventually became Stuart Corp.'s on-site managers of an apartment complex. Backstrom appeared unexpectedly at the site and made a comment to Giuliani that he wanted "to try and eliminate some guilt." Backstrom then informed Swenson that the apartment complex managed by Giuliani was in poor shape. He also instructed Swenson to terminate Giuliani. Contrary to Backstrom's report, Swenson's inspection revealed that the apartment complex was well managed. Sensing Swenson's confusion, the Giulianis decided to confide in her about Backstrom's conduct and asked Swenson to keep these confidences a secret. Swenson told the Giulianis that she had a legal responsibility to report the conduct, but she did not do so, although Giuliani's husband told her to go ahead and report it if that was what she had to do.

Giuliani subsequently applied and was rejected for two property management positions. One of these was subsequently filled by Ellen Schnur, who became Giuliani's new supervisor. The Giulianis also told Schnur of Backstrom's propositions and behavior. Schnur remarked that Giuliani was visibly distraught about Backstrom's conduct.

After receiving reports that money was missing from the complex's laundry machines, Backstrom instructed Schnur to fire both the Giulianis. However, Stuart Corp. postponed dismissing them after Schnur told Backstrom of Giuliani's allegations. Stuart Corp. began an investigation of the allegations and suggested that she meet with the company attorneys. Giuliani decided to retain her own counsel and commenced this lawsuit in September 1990.

Stuart Corp. terminated Backstrom after corroborating Giuliani's report of sexual harassment. That year, the Giulianis received no Christmas bonus, although the rest of the employees at their complex did. This action, they testified, conflicted with Schnur's high rating of the Giulianis' performance. Schnur's replacement gave them a similar rating. Nonetheless, Stuart Corp. fired Giuliani's husband, citing the controversy over diminished receipts from the apartment complex laundry machines. Giuliani thereafter resigned.

The Giulianis brought separate actions for the denial of their Christmas bonuses as well as for wrongful discharge of Giuliani's husband and a resulting constructive discharge of Giuliani. The trial court ultimately dismissed these claims but ordered judgment entered in Giuliani's favor on her sexual harassment claims. Giuliani was awarded damages of $12,000 for mental anguish and suffering, together with attorney fees in the sum of $18,527.50 plus costs.

## ISSUES

I. Does the evidence support the trial court's findings that:

A. Giuliani was sexually harassed?

B. Stuart Corp. engaged in reprisals?

C. Stuart Corp. did not take timely and appropriate action?

II. Was Giuliani's claim barred by the statute of limitations?

III. Did Giuliani waive or forfeit her claim?

IV. Did the trial court make a proper award of attorney fees?

V. Did the trial court make a proper award of a civil penalty to the State of Minnesota?

## DISCUSSION

### I. The Trial Court's Findings
#### Standard of Review

■ A trial court's findings will be reversed only if the result is clearly erroneous. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 441 (Minn.1983); *Bougie v. Sibley Manor, Inc.*, 504 N.W.2d 493, 497 (Minn. App.1993). "This deference is especially strong in employment discrimination cases." *Kay v. Peter Motor Co.*, 483 N.W.2d 481, 483 (Minn.App.1992) (citing *Sigurdson v. Isanti County*, 386 N.W.2d 715, 721 (Minn.1986)). Under the "clearly erroneous" standard, the findings of the trial court will not be disturbed if they are reasonably supported by evidence in the record considered as a whole. *Hubbard*, 330 N.W.2d at 441. Clearly erroneous means "without substantial evidentiary support or * * * induced by an erroneous view of the law." *Johnson v. Ramsey County*, 424 N.W.2d 800, 804 (Minn.App.1988) (citing *Anda Constr. Co. v. First Fed. Savings & Loan Assoc.*, 349 N.W.2d 275, 277 (Minn.App. 1984), *pet. for rev. denied* (Minn. Sept. 5, 1984)).

### A. Giuliani Was Sexually Harassed

■ The trial court's finding that Giuliani was sexually harassed was not clearly erroneous. At its core, this case concerns an employee of the Stuart Corporation who, on her record, stood a good chance of further advancing within the company. After she objected to her supervisor's sexual propositions, her career was, in effect, blunted.

Backstrom's comments that he was intelligent to leave no evidence (the card) of his improper actions and that he does not take rejection well appear, in perspective, fraught with meaning that he was aware of the illegality of his actions. From that day forward, Giuliani's career prospects rapidly dimmed, ultimately resulting in what she claims was a forced resignation. The court properly found that these events were manifestations of Backstrom's failure to take rejection well. Stuart's attempt to trivialize Backstrom's advances and Giuliani's reaction to them by pointing to an absence of lurid gestures, vulgar language, or sexual touching does not undercut the trial court's resolution of this case.

### B. Reprisals

■ Stuart Corp. claims that there was no evidence of reprisals because Giuliani did not carry her burden, imposed by *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to show pretext after it proffered legitimate nondiscriminatory reasons for business decisions adverse to her. Stuart likewise alleges that Giuliani cannot show that any retaliatory conduct on the part of Stuart had an adverse impact on her employment.

The three-part burden-shifting scheme for discrimination claims established in *McDonnell–Douglas* and adopted by the supreme court in *Danz v. Jones*, 263 N.W.2d 395, 398–99 (Minn.1978), is applicable here:

1. The plaintiff has the initial burden of proving a prima facie case of discrimination;

2. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to present evidence of some legitimate nondiscriminatory reason for its actions; and

3. If the defendant meets this burden, the Plaintiff then has the opportunity to show that the Defendant's presumptively valid reasons are in fact a pretext obscuring discrimination.

*McDonnell–Douglas*, 411 U.S. at 802–05, 93 S.Ct. at 1824–26.

The trial court identified seven business decisions of Stuart Corp. adverse to Giuliani after the incidents of sexual harassment:

1. Failure to include Giuliani among the invitees to a party she organized for employees of apartment guides and referral services.

2. Rejection of Giuliani's application to take a property management course, contrary to prior representations.

3. Backstrom's informing Giuliani's supervisor, Elaine Swenson, that there were problems at Giuliani's apartment complex when it, in fact, was well-managed.

4. Backstrom's asking Swenson to terminate Giuliani's employment without explanation.

5. Backstrom's asking Schnur to terminate Giuliani's employment.

6. Backstrom's request that Schnur "keep an eye" on the Giulianis.

7. Backstrom's choice of Schnur over Giuliani for a property manager's position.

While the incidents examined individually might seem inconsequential, in the aggregate they illustrate a course of conduct creating a hostile environment. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986); *Continental Can Co., Inc. v. State,* 297 N.W.2d 241, 248–49 (Minn.1980) (sexual harassment includes such conduct having the effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment); *Harris v. Forklift Sys.,* —— U.S. ——, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993) (all circumstances must be examined in hostile work environment cases brought under Title VII); *Johnson,* 424 N.W.2d at 808–09 (district court must look at the incidents collectively to see if discrimination has occurred).

Stuart did not advance legitimate business reasons for all of the reprisals; moreover the trial court deemed what reasons it did advance unworthy of credence. Thus, the burden did not shift to Giuliani to show pretext on these points. The court noted:

Although it is true that, even after January 16, 1989, Backstrom did make decisions favorable to Mrs. Giuliani's employment, there is a pattern of retaliatory conduct on Backstrom's part that continued at least until June 1990.

We cannot seriously credit Stuart Corp.'s claim that even if the above-mentioned actions were retaliatory, they did not have any adverse effect on Giuliani's employment. We defer here to the trial court's well-supported findings:

Particularly damaging were Backstrom's unsubstantiated accusation to Nolan and Schnur that there were many problems at Century North and his advice to Schnur to keep an eye on the Giulianis. Such statements clearly tend to undermine trust and confidence in Mrs. Giuliani's ability to perform her job. By all accounts Mrs. Giuliani had been a competent and diligent site manager and a loyal employee of the defendant. She had aspiration of improving her abilities through both experience and education. She had hopes of becoming a property manager with the defendant. Negative statements from her long-time supervisor to the corporation's owner and to her immediate supervisor would certainly be obstacles to the realization of her ambitions.

We reject Stuart Corp.'s suggestion that, even though Backstrom instructed Swenson and Schnur to fire Giuliani, the fact that they did not do so renders the comments innocuous. Instructing Giuliani's supervisors to fire her was an integral part of Backstrom's systematic undermining of Giuliani after her rejection of his advances.

The cases of *Lane v. Ground Round,* 775 F.Supp. 1219 (E.D.Mo.1991), and *Minneapolis Police Dept. v. Minneapolis, Comm. on Civil Rights,* 425 N.W.2d 235 (Minn.1988), raised by Stuart Corp., are inapposite. In *Minneapolis Police,* plaintiff's transfer to a different shift did not affect her employment adversely, because her pay was the same and her superiors had a legitimate business reason for the transfer. Her supervisor's recommended reprimand was not deemed a reprisal, because a more senior supervisor overruled the recommendation. *Minneapolis Police,* 425 N.W.2d at 240. Neither Elaine Swenson nor Ellen Schnur had such

power to overrule, because they were the subordinates of Backstrom.

In *Lane,* the harasser had no supervisory role whatsoever over the employee when the alleged acts of reprisal occurred. The incidents in this case, however, all occurred while Backstrom held a position of authority over Giuliani. The trial court's finding that Backstrom's reprisals adversely affected her employment are not clearly erroneous, nor are they contrary to the law.

### C. "Timely and Appropriate Action"

■ Stuart Corp. alleges that judgment for Giuliani was improper because Stuart took timely and appropriate action in response to her allegations.

The prohibition against sex discrimination in Minn.Stat. § 363.03, subd. 1(2)(c), includes sexual harassment which affects conditions of employment when the employer knows or should have known of the employee's conduct and fails to take timely and appropriate action. Minn.Stat. § 363.01, subd. 41 (1990); *Tretter v. Liquipak Int'l, Inc.,* 356 N.W.2d 713, 715 (Minn.App.1984).

Whether knowledge of a supervisor's sexual harassment is imputed to the employer is determined on a case-by-case basis. *Fore v. Health Dimensions, Inc.,* 509 N.W.2d 557 (Minn.App.1993). An employer is not strictly liable for the acts of harassment perpetrated by one of its supervisors. *Id.* Nonetheless, our courts have imputed knowledge of a supervisor's sexual harassment to the employer in certain cases. *See McNabb v. Cub Foods,* 352 N.W.2d 378, 383 (Minn.1984); *Tretter,* 356 N.W.2d at 715. The rationale for such decisions is understandable. Victims of sexual harassment by managers are more likely to remain silent for fear of jeopardizing their employment. Moreover, an employer, by selecting its supervisors, agrees that these persons will act as its agents. Sexual harassment of an employee by a supervisor is thus directly connected with the employer's actions. In *Fore,* although the court did not decide whether knowledge of a supervisor's sexually harassing actions was imputable to the employer, the suggestion is that it was. The court determined that the employer had taken timely and appropriate action by firing the harasser five days after the first incident

of sexual harassment. The analogy to this case is that Stuart Corp.'s knowledge of the harassment began in December of 1988, the time of the first instance of harassment, which was, we note, perpetrated by a vice president of the corporation. Stuart Corp. did not respond to the allegations until September of 1990, almost two years after the original incident. This was not timely and appropriate action.

Stuart Corp. contends that the imputed-knowledge principle we employ here is in the nature of strict liability. Although we do not state such a broad principle here, we wish to emphasize the fact that Stuart Corp. had no sexual harassment policy to deal with Giuliani's allegations. When companies institute written policies established to deal intelligently with allegations of sexual harassment, it is more likely that management will be informed of any impropriety occurring within the company. Companies that fail to institute such policies will naturally find themselves vulnerable to the likelihood that knowledge will be imputed to them.

### II. Statute of Limitations

■ Giuliani's claim is not barred by the statute of limitations. Claims brought under the Human Rights Act must be filed within one year of the alleged discriminatory act. Minn.Stat. § 363.06, subd. 3 (1990). An exception to this rule is the doctrine of continuing violations—"the unlawful employment practice manifests itself over time, rather than as a series of discrete acts." *Lane,* 775 F.Supp. at 1224; *see also Hubbard,* 330 N.W.2d at 440–41 n. 11. To establish a continuing violation, a plaintiff must show that at least one incident of harassment occurred within the limitations period. *Lane,* 775 F.Supp. at 1224.

The trial court found, and the record supports, that Giuliani's rebuff of Backstrom's advances precipitated a series of events which had an adverse impact on Giuliani's career prospects within Stuart. The court deemed these events manifestations of Backstrom's warning that he does not take rejection well and this retaliatory conduct flowed directly from the original sexual harassment. The evidence supporting this conclusion was

the marked contrast between Backstrom's active encouragement of Giuliani's career in property management from 1983 until early 1989 and the employment decisions by Backstrom adverse to Giuliani which followed. The latter of these fall well within the statute of limitations period and establish a continuing violation of the Human Rights Act.

Stuart Corp. argues that, since reprisal claims are described separately from other discriminatory practices in the Human Rights Act, they cannot constitute a continuing sexual harassment violation. The Human Rights Act specifies that it covers acts of retaliation against individuals who oppose *any* practice forbidden under the Act. Establishment of a separate "Reprisals" section, rather than including such a section within each description of a forbidden discriminatory practice, is merely efficient legislative draftsmanship.

Stuart Corp. suggests that the reprisals against Giuliani were mere "consequences" of discriminatory acts and thus do not qualify as continuing violations. The case cited for the proposition, *Sigurdson v. Isanti County*, 448 N.W.2d 62, 67 (Minn.1989), supports Giuliani, however. A "consequence," according to the *Sigurdson* court, is merely a "continuing effect." *Id.* Backstrom's reprisals were not only continuing effects but were discriminatory acts in and of themselves. Giuliani's claim of sexual harassment is thus not barred by the statute of limitations.

### III. Waiver and Forfeiture

Stuart argues that Giuliani either waived her claim by asking those in whom she confided to keep it a secret or forfeited her claim by retaining an attorney in lieu of meeting personally with counsel for Stuart. These arguments are unpersuasive.

■ Giuliani had no power to command management to remain silent about her report of harassment. The persons in whom she confided recognized their legal obligation to report her allegations to officials of the company; they simply did not do so. Giuliani's husband released Swenson from the confidentiality request if she felt she could not honor it.

■ Stuart Corp. cannot support its argument of forfeiture. Giuliani's retention of counsel did not constitute failure to cooperate in Stuart Corp.'s investigation of her claim. By retaining counsel, Giuliani recognized the importance of full representation of her position in the dispute.

### IV. Attorney Fees

■ Although admitting that opposing counsel's hourly rate for legal services is reasonable, Stuart Corp. nonetheless challenges the reasonableness of the award of attorney fees made in this case. A district court's decision on the reasonableness of costs is subject to review under an abuse of discretion standard. *Koop v. Independent Sch. Dist. No. 624*, 505 N.W.2d 93, 94 (Minn. App.1993).

The trial court in this case commented on the reasonableness of the fees as follows:

The plaintiff's attorney has itemized the time he spent on the claims as to which Ms. Giuliani prevailed. There is nothing in the itemization of the "office" work that appears excessive. Based on the plaintiff's attorney's representation that all hours shown on the itemization pertained only to the file in which Ms. Giuliani was successful, all fees for office work on that file should be allowed.

We believe the trial court's inquiry was adequate. The judge who saw the case tried was in a much better position than we are to ensure that fees relating only to the claim prevailed upon would be awarded. We note as well the trial court's recognition that the fee for *trying* all three actions must be reduced, given the fact that Giuliani prevailed on only one. Under these circumstances, the trial court's exercise of discretion cannot be said to have been an abuse.

The legislature, in enacting the Minnesota Human Rights Act, has specifically provided for awards of attorney fees. Minn.Stat. § 363.14, subd. 3 (1990). In light of the complexity of these cases, often involving modest damages, it is not surprising nor particularly material that the attorney fees in this case exceed the amount of damages awarded. Attorneys who prevail in discrimination cases before our courts serve an im-

portant public function which accomplishes a social objective identified by the Human Rights Act.

## V. Civil Penalty

When a party is found to be liable for unfair acts under Minn.Stat. § 363.03, the court shall order a party to pay a civil penalty to the state. The amount of the penalty is based on the seriousness of the violation under the Minnesota Human Rights Act, the public harm caused by the violation, the intentional nature of the violation, and the financial resources of the party violating the Act. Minn.Stat. § 363.071, subd. 2 (1990). Under these circumstances, the modest civil penalty of $500 awarded to the State of Minnesota was proper.

## DECISION

Giuliani was sexually harassed by Backstrom and suffered reprisals for her refusal to accede to his propositions. Stuart Corp. failed to take timely and appropriate action to address these incidents. Giuliani's claim was not barred by the statute of limitations, nor did she waive or forfeit her claim. The trial court's award of attorney fees and a civil penalty in favor of the State of Minnesota were proper.

**Affirmed.**