# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1834

_____

Robert Mems; Nathanial Khaliq;     *
Phillip Webb; Thurman Smith;     *
Byron Brown,     *
    *
         Appellants,     *
    *    Appeal from the United States
      v.     *    District Court for the
    *    District of Minnesota.
City of St. Paul, Department of Fire     *
and Safety Services,     *
    *
         Appellee.     *

_____

Submitted: December 13, 2002
Filed: April 30, 2003

_____

Before WOLLMAN, HEANEY, and MAGILL, Circuit Judges.

_____

MAGILL, Circuit Judge.

African-American firefighters Robert Mems, Nathanial Khaliq, Phillip Webb, Thurman Smith, and Byron Brown (collectively "Appellants") sued their employer, the City of St. Paul, Department of Fire and Safety Services ("City" or "SPFD"), under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363.03 (2000), and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e - 2000e-17 (2000), alleging that they had been subjected to illegal race harassment and had experienced a hostile work environment. Appellants Mems, Khaliq, Smith, and

Brown appeal from the final judgment entered on the jury verdict in favor of the City. Appellant Webb appeals from the final judgment entered on the jury verdict awarding him $1 in damages. Appellants also appeal the district court's[1] subsequent denial of their new trial motion. For the following reasons, we affirm.

## I.

### A.    Background

SPFD is organized into three shifts at each fire station, known as the A, B, and C shifts. Each shift is on duty for twenty-four hours at a time, and the firefighters live, eat, and work at their station while on duty. The shifts rotate so that the B shift relieves the A shift half of the time and relieves the C shift the other half of the time. The firefighters bid for the shift and station they work at through a seniority-based system.

In 1992, eleven African-American firefighters brought a lawsuit against the City, alleging discrimination and harassment between 1975 and 1991. Appellants Mems, Khaliq, Smith, and Brown were parties to the suit. The case settled in June 1994. As part of the settlement, the first minority to sit on the administration, Anthony Carter, an African American, was chosen to serve in the newly created Assistant Chief position. In addition, the settlement released the City from all claims that these Appellants might have had against the City arising before June 17, 1994.

When the settlement was announced, Appellants Mems, Brown, Webb, and Khaliq worked at St. Paul Fire Station 20 on the B shift. At this time, six African-American men and two Caucasian men made up the B shift. The A shift consisted of

---

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

all Caucasian men.  Appellant Smith worked the C shift at station 20, but occasionally filled in for other firefighters on the B shift.

## B.     Alleged Racial Harassment

### 1.     Appellant Smith

In August 1994, Smith was filling in for an A-shift firefighter, when a Caucasian A-shift firefighter reported the smell of alcohol on Smith's breath.  Captain Rodney Bergstrom and District Chief Dick Wiesner asked Smith about the allegation.  Smith offered to let them smell his breath and satisfied their concerns.

In the fall of 1996, an African-American B-shift firefighter told B-shift Captain Ross that he saw what appeared to be crack cocaine fall from Smith's locker.  Ross reported the information to Assistant Chief Carter.  Carter called the St. Paul Police Department, and the police came to the station, where they confronted and questioned Smith.  Smith consented to a search of his person and locker, which yielded no drugs.

### 2.     A shift versus B shift in station 20

Appellants testified that, shortly after the 1994 settlement, the A shift started harassing the B shift.

Appellants testified that the A shift sabotaged the fire station several times by hiding cooking utensils, leaving the windows open in the winter time, and turning the heat up excessively before the B shift came on duty.  In addition, A-shift Captain Rodney Bergstrom would often conduct a white-glove inspection of the fire department when the B shift was coming off duty and the A shift was coming on duty.  B-shift Captain John Dubois testified that these housekeeping issues were common disputes among shifts.   These housekeeping complaints were never

contemporaneously reported to Captain Dubois, and he never saw the windows open or the thermostat up.

In January 1995, members of the A shift complained that members of the B shift were staying at the station after the B shift ended. In response, the B shift was directed to be out of the station by 8:00 a.m., the time of the shift change. This was the first order of this kind at station 20. Mems and Khaliq subsequently filed a race discrimination claim concerning this order. Assistant Chief Carter rescinded the order and investigated the matter.

In February 1995, an email was sent by a Caucasian A-shift firefighter, Mark Montanari, regarding the 1994 settlement: "I feel that I can fully acept [sic] the healing process much easier for [redaction]. That would help me greatly to be able to work together in a more relaxed mode."[2] Trial Ex. No. 112. Appellants complained about the email, but Montanari was never disciplined.

Also in February 1995, a meeting was held between the A- and B-shift members. During this meeting, at least one firefighter admitted that there were racial tensions in the station.

In May of 1995, offensive photographs were posted at station 20 on the bulletin board. Captain Ness was given an oral reprimand for this posting.

In the months following Captain Ness's reprimand, Mems' fire gear, fire rig, and equipment were damaged. Captain Ross and Assistant Chief Carter concluded that the problems with the equipment were likely accidental, and the City investigation concluded that Mems' gear experienced normal wear and tear.

---

[2]Pursuant to an agreement by the parties, the amount of money paid in the settlement was redacted from this exhibit.

Until May 1995, for a period of at least seven years, Pat McCardle, a Caucasian A-shift firefighter, relieved Webb immediately upon McCardle's arrival at station 20, even if it was before the 8:00 a.m. shift change. On May 16, 1995, without any word to Webb, McCardle did not take a run for Webb that came in before 8:00 a.m. Again, on July 1, 1995, McCardle did not relieve Webb when an alarm came in at 7:48 a.m. When Webb came back from the July run, he confronted McCardle regarding these instances, and an argument ensued. After this confrontation, McCardle complained that he felt threatened by Webb. On November 14, 1995, following an investigation, Webb received a verbal reprimand for violation of the SPFD's policy of respect. On July 3, 1995, McCardle took a run for Webb before 8:00 a.m., and McCardle continued to take runs for Webb until McCardle retired in December 1998.

On December 4, 1995, Webb filed a race harassment claim with the St. Paul City Department of Human Rights ("DHR"), alleging that McCardle's failure to take the above-mentioned runs was motivated by racial hostility. B-shift Captain Dubois, a Caucasian, helped Webb to file the complaint.

In February 1996, Captain Dubois filed his own complaint against Harold Strassner, a Caucasian A-shift firefighter, claiming racial hostility. After Strassner learned that he was mentioned in Webb's complaint, Strassner threatened to sue Dubois. At trial and in his complaint, Dubois explained that he was treated poorly by A-shift personnel because he stood up for his B-shift personnel.

In the spring of 1996, B-shift firefighters coming on duty after the A-shift found cartoons and articles from the Conservative Chronicle, which Appellants testified they considered racist. Appellants complained to their supervisors about the cartoons. No offensive cartoons appeared in the station again after the complaint.

In early May 1996, DHR finished its investigation of Webb's claim regarding McCardle and forwarded its finding to Chief Fuller. The DHR suggested, in its cover

letter, that the City should ensure compliance with anti-discrimination laws because some of the interviewees expressed concerns about a "hostile work environment." Trial Ex. No. 317. DHR found that there was probable cause to believe that McCardle's actions toward Webb were retaliatory for the 1994 settlement and for Captain Ness's reprimand for posting the offensive pictures. In addition, DHR found probable cause to believe that McCardle violated workplace conduct policy by not informing Webb that he no longer would be taking the runs.

On May 20, 1996, Webb called Assistant Chief Carter, asked if the DHR report was complete, and requested a copy. Carter told Webb that in a few days Carter would have something in writing for Webb regarding the report.

On May 21, 1996, Assistant Chief Carter drafted a letter of reprimand for McCardle, but did not send it. Instead, Carter decided to investigate the claim further because he could not find a standard operating procedure that McCardle had violated.

On May 22, 1996, Assistant Chief Carter had two conversations with Webb. First, Carter called Webb to inform Webb that he was still working on putting something in writing regarding the investigation results. At the time of the call, Webb was on duty at station 20. The conversation became hostile. Assistant Chief Carter then ordered Webb to come down to headquarters where their second conversation took place. This conversation was heated as well. Webb returned to station 20 and took the rest of the day off sick. A few days later, Webb was sent for a fitness-for-duty exam.

Shortly thereafter, Carter forwarded the DHR report to the Affirmative Action Director and the City Attorneys' Office. Neither found supporting evidence for the DHR's conclusions that McCardle's actions were retaliatory or that he violated any workplace policy. On June 10, 1996, Carter sent a letter to McCardle indicating that

McCardle's actions were not racially motivated and there was not enough evidence to support disciplinary action.

During the summer of 1996, a basketball hoop primarily used by B-shift firefighters was vandalized at least three times. Also during the summer of 1996, Anna Maravelas, a conflict specialist with no training in race relations, was hired to address problems at station 20.

In October 1996, Mems, as President of the Black Firefighters United Organization, sent a letter to the NAACP, requesting that the NAACP, on behalf of African-American firefighters including the Appellants, conduct an independent investigation regarding the concerns with racial hostility because the City was not resolving the problem. On November 15, 1996, a race harassment claim was filed with the Equal Employment Opportunity Commission ("EEOC"), on behalf of the African-American firefighters.

In November 1996, Khaliq met with Chief Fuller. Khaliq gave Chief Fuller a summary of events Khaliq considered racially hostile and harassing. Chief Fuller took no action in response to this meeting.

In December 1996, Khaliq found two of his magazines destroyed at station 20: American Legacy and Al Jumuah. Al Jumuah was in the trash and covered with grease. The cover of American Legacy, which depicted national guardsmen and African-American children, was ripped in half, with the half of the national guardsmen ripped into small pieces. Khaliq filed a racial harassment complaint with Assistant Chief Carter. Assistant Chief Carter personally interviewed everyone on the A shift and had the police test the magazines for fingerprints. No culprit was found.

Khaliq testified that at some point in 1996 he found his car damaged in the station 20 parking lot: it was scratched and his fender was bent. In addition, Webb testified that some time in 1996 his truck's lug nuts were loosened, almost causing an accident.

Mems and Brown testified that unlike Caucasian firefighters, they were required to wear their full turn out gear to fires. District Chief Verros testified that all Fire Equipment Operators are required to wear their full turn out gear for safety reasons.

### 3. Khaliq and District Chief Zilliox in Station 14

In December 1998, while Khaliq was working in station 14, District Chief Zilliox denied Khaliq a meal hour over the Christmas holiday, and in response, Khaliq filed a race harassment complaint against Zilliox. Chief Zilliox testified that due to staffing levels, he could not give everyone a meal hour, and that, accommodating as many people as possible, several firefighters at several stations could not take a meal hour.

### C. Procedural history

Appellants commenced this action in the United States District Court for the District of Minnesota[3] in 1997, alleging violations of Title VII and the MHRA, including discriminatory promotional practices, discriminatory disciplinary practices, and a hostile work environment. On May 28, 1999, the district court granted summary judgment for the City, dismissing all claims. On appeal to this court, we reversed in part, finding genuine issues of material fact as to Appellants' disparate treatment claim. Mems v. City of St. Paul, 224 F.3d 735 (8th Cir. 2000).

On November 19, 2001, the jury trial commenced. After a three-week trial and ten days of jury deliberation, the jury found the City liable to Appellant Webb only.

---

[3]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, presided over this case initially. After we reversed in part the district court's grant of summary judgment for the City, the Honorable Paul A. Magnuson presided over the trial.

Specifically, the jury found (1) in favor of Appellant Webb, awarding him $1 in damages; (2) that Appellants Mems and Khaliq failed to establish that the City knew or should have known of the harassment and failed to take prompt and effective remedial action; (3) that Appellant Brown failed to establish that harassment affected a term, condition, or privilege of his employment; and (4) that Appellant Smith failed to establish a causal nexus between the harassment and his race. The district court entered final judgment on the verdict on February 15, 2002, and denied Appellants' subsequent motion for a new trial. This appeal follows.

## II.

Appellants present four arguments on appeal. First, Appellants claim that the district court abused its discretion in numerous evidentiary rulings. Second, Appellants claim that the district court abused its discretion in jury instructions 12, 16, 18, and 22. Third, Appellants argue that the district court applied the wrong damages period to Appellants' claims. Fourth, Appellants claim that the district court abused its discretion in denying their motion for a new trial.

### A. Evidentiary Rulings

First, Appellants argue that the district court abused its discretion by excluding (1) the expert testimony of Dr. John Taborn, and (2) other evidence of their prima facie case. We disagree.

#### 1. Dr. Taborn's Testimony

Appellants proffered Dr. Taborn's testimony as an expert witness on emotional

damages.[4] The City challenged the introduction of Dr. Taborn's testimony in a motion in limine. After a <u>Daubert</u> hearing, the district court denied the motion. Subsequently, the district court excluded the testimony on two grounds: (1) as a discovery sanction pursuant to Federal Rule of Civil Procedure 37; and (2) upon reconsideration of its earlier <u>Daubert</u> ruling, the district court decided to reverse its earlier ruling. Appellants argue that the district court erred in barring the expert testimony of Dr. Taborn. We disagree.

A district court's decision to impose a discovery sanction under Federal Rule of Civil Procedure 37 will not be reversed by this court, absent abuse of discretion. <u>Chrysler Corp. v. Carey</u>, 186 F.3d 1016, 1019 (8th Cir. 1999) (citation omitted). Similarly, this court reviews a district court's decision to exclude expert testimony for abuse of discretion. <u>General Elec. Co. v. Joiner</u>, 522 U.S. 136, 143 (1997). Ultimately, Appellants must show two things to gain relief from a faulty evidentiary ruling: (1) that the district court abused its discretion, and (2) that the evidentiary ruling was prejudicial to the point of producing a different verdict. <u>See</u> <u>Bevan v. Honeywell, Inc.</u>, 118 F.3d 603, 612 (8th Cir. 1997).

"In order to impose sanctions under Rule 37, there must be an order compelling discovery, a willful violation of that order, and prejudice to the other party." <u>Chrysler Corp.</u>, 186 F.3d at 1019 (citation omitted). The district court found a willful violation of the expert pretrial discovery order and prejudice to the City because of that violation. Accordingly, the district court excluded Dr. Taborn's testimony as a sanction for Appellants' "egregious abuse of the judicial process." D. Ct. Op. at 3.

Under Federal Rule of Civil Procedure 26(a)(2)(B), a testifying expert must

---

[4]We note that Dr. Taborn was excluded as an expert <u>damages</u> witness. The jury only reached the issue of damages for Appellant Webb. Thus, only Appellant Webb can claim the alleged adverse effects of the district court's evidentiary ruling regarding Dr. Taborn.

submit a signed written report prior to trial, containing, <u>inter</u> <u>alia</u>, "a complete statement of all opinions to be expressed and the basis and reasons therefor" and "the data or other information considered by the witness in forming the opinions." Fed. R. Civ. P. 26(a)(2)(B) (2003). Additionally, the district court's pretrial orders required expert discovery and disclosure to be completed before trial commenced. Under Federal Rule of Civil Procedure 26(e), a party is required to supplement and seasonably amend disclosures.

Dr. Taborn re-interviewed each Appellant during the recess week of trial. Dr. Taborn took notes of these meetings; these notes include factual allegations and symptoms not in Dr. Taborn's other reports. The meetings and the notes were not disclosed to the City until after business hours on the night before Dr. Taborn was scheduled to testify. The district court, pursuant to Federal Rule of Civil Procedure 37, finding that "granting a continuance or rescheduling the testimony of Dr. Taborn was insufficient to remedy Plaintiffs' egregious abuse of judicial process," excluded Dr. Taborn's testimony. D. Ct. Op. at 3.

The main argument that Appellants rely on is that the district court inaccurately determined that Dr. Taborn's notes were a supplemental report and thus abused its discretion in excluding the testimony. However, the City correctly points out that the rules required Appellants to disclose "a complete statement of all opinions to be expressed and the basis and reasons therefor" and "the data or other information considered by the witness in forming the opinions" and to supplement that disclosure if necessary. Fed. R. Civ. P. 26(a)(2)(B), 26(e). Appellants failed to do so.

Despite Appellants' arguments, the district court was well within its discretion in excluding the testimony as a sanction for failure to comply with the rules of discovery. <u>See</u> <u>Chrysler Corp.</u>, 186 F.3d at 1022 (discussing that a district court need not impose the least onerous sanction and that sanctions are not only to penalize, but to deter). Accordingly, it is unnecessary to review the district court's reconsideration

of its <u>Daubert</u> ruling. We conclude that the district court did not abuse its discretion in excluding the testimony of Dr. Taborn.

## 2.     Other Evidence

Appellants claim that the district court abused its discretion by unfairly excluding other evidence that would have established their prima facie case of discrimination[5]: (1) two photographs of A-shift Captain Ness that were posted at station 20 and testimony regarding the photograph; (2) evidence regarding a hangman noose carved into a piece of furniture; (3) testimony regarding a conversation between B-shift Captain Dubois and A-shift Captain Ness; (4) testimony of witnesses showing racial motivation; (5) testimony of Debra Giles Smith; and (6) evidence that Appellants failed to take promotional exams and retired early.[6] We disagree.

As mentioned above, Appellants must show that the district court abused its discretion and that the ruling was prejudicial to the point of producing a different result. <u>See</u> <u>Bevan</u>, 118 F.3d at 612. Having thoroughly reviewed the record and the parties' arguments, we find no abuse of discretion. Moreover, even assuming <u>arguendo</u> there was an error, we are convinced that the rulings would not have altered the outcome of the jury verdicts.

---

[5]These evidentiary rulings could not have any bearing on Webb's case because the jury found that he had proved liability. Also, because Smith typically did not work the A shift, many of the evidentiary rulings complained of would not affect his claim.

[6]As to the evidence that Appellants retired early, Appellants also suggest that they should have been allowed to amend their Complaint to include a claim of constructive discharge. However, as recognized by the district court, Appellants never requested leave to amend their Complaint and this claim is completely without merit.

**B.      Jury Instructions**

Second, Appellants argue that the district court abused its discretion in its formulation of jury instructions 12, 16, 18, and 22.  We review a district court's jury instructions for abuse of discretion.  Warren v. Prejean, 301 F.3d 893, 900 (8th Cir. 2002) (citing B & B Hardware, Inc. v. Hargis Indus., Inc., 252 F.3d 1010, 1012-13 (8th Cir. 2001)).  We note that "a district court has broad discretion in instructing the jury, and jury instructions do not need to be technically perfect or even a model of clarity."  B & B Hardware, 252 F.3d at 1012-13 (citations and internal quotations omitted).  Our review is limited in scope: we ask "whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury."  Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 711 (8th Cir. 2001) (quoting White v. Honeywell, Inc., 141 F.3d 1270, 1278 (8th Cir. 1998)) (internal quotations omitted).  We will reverse only upon a finding that the instructional error affected the substantial rights of the parties.  Id. (quoting Honeywell, 141 F.3d at 1278).

**1.      Jury Instruction Number 12**

Instruction number 12, entitled "The Issue," reads as follows:

[i]t is unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such an individual's race.
In this case, each Plaintiff claims that Defendant City of St. Paul discriminated against him because of his race.  Plaintiffs claim that they were subjected to a racially hostile or abusive working environment. Defendant City of St. Paul denies this charge and claims that Plaintiffs unreasonably failed to take advantage of corrective opportunities.

J.A. at 389 (emphasis added). Appellants suggest that the City never claimed that Appellants failed to take advantage of corrective opportunities. We disagree.

In fact, the City did claim that Appellants failed to take affirmative steps to mitigate the situation, and furthermore offered proof that Appellants failed to avail themselves of the City's anti-harassment complaint procedures. Proof that an employer promulgated an anti-harassment policy with complaint procedures and proof that an employee failed to use the complaint procedures is relevant in determining employer liability for a supervisor's alleged racial harassment that does not result in a tangible injury, as it may constitute a defense. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998). Therefore, we find no abuse of discretion by the district court with regard to instruction number 12.

### 2.    Jury Instruction Number 16

Instruction number 16, entitled "Unwelcome Harassment," states that "[i]n order to constitute harassment, the conduct must be 'unwelcome' in the sense that each Plaintiff did not solicit or invite it, and each Plaintiff regarded the conduct as undesirable or offensive." J.A. at 394. We need not resolve Appellants' complaints with regard to this instruction because the jury found that each Appellant suffered unwelcome harassment, and accordingly, the argument is moot.

### 3.    Jury Instruction Number 18

Instruction number 18, entitled "Hostile or Abusive Work Environment," provides:

> [i]n order for a racially hostile environment to be actionable, it must be so severe or pervasive as to alter the conditions of each Plaintiff's employment and create an abusive working environment.

Each Plaintiff, in other words, must show a practice or pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient. Whether racial harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well-being of employees is a question to be determined in light of the totality of the circumstances.

In determining whether a reasonable person in each Plaintiff's circumstances would find his work environment to be hostile or abusive, the relevant factors to consider include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance; the physical proximity of the harasser; and the presence or absence of other people.

Simple teasing, offhand comments and isolated incidents (unless extremely serious), however, will not amount to discriminatory changes in the terms and conditions of employment. For example, the mere utterance of an ethnic or racial epithet which engenders offensive feelings in a Plaintiff may not sufficiently alter the terms and conditions of employment. Discourtesy and rudeness should not be confused with racial harassment and a lack of racial sensitivity, does not, alone, amount to actionable harassment. The law governing racial discrimination does not create a claim for all unpleasant or abusive behavior in the workplace; it is not a general civility code and does not apply to the normal tribulations of the workplace, such as the sporadic use of abusive language, race-related jokes and occasional teasing. The conduct must be extreme to amount to a change in the terms and conditions of employment.

A Plaintiff may only rely on evidence relating to discrimination that he was aware of during the time that he was allegedly subjected to a hostile work environment. A Plaintiff cannot subjectively perceive behavior towards others as creating a hostile work environment unless he knew about the behavior.

J.A. at 396-97. Appellants claim that the elements of hostile and abusive work environment in instruction number 18 differed from the elements in instruction number 15,[7] and that the examples in instruction number 18 unfairly commented on the Appellants' evidence and their case. We disagree.

First, instruction number 18 explains in more detail the contours of the elements of a hostile work environment, but does not conflict with instruction number 15. Second, Appellants cite Caviness v. Nucor-Yamato Steel Co., 105 F.3d 1216 (8th Cir. 1997), and Tyler v. Hot Springs School District No. 6, 827 F.2d 1227 (8th Cir. 1987), as supporting their claim that the district court, in instruction number 18, unfairly commented on Appellants' evidence. In Caviness, we warned that a district court should not put "undue emphasis" on one party's evidence. 105 F.3d at 1222 (citation omitted). In Tyler, we held that the district court did not err in refusing to

_____

[7] Instruction number 15, entitled "Elements of Claim," provides:

[y]our verdict must be for each Plaintiff on his claim of a hostile working environment if each Plaintiff proves all of the following elements by a preponderance of the evidence:
(1) He was subjected to unwelcome harassment;
(2) There was a causal nexus or a motivating factor between the harassment and his race;
(3) The harassment was sufficiently severe or pervasive that a reasonable person would find that the harassment affected a term, condition, or privilege of employment;
(4) Defendant knew or should have known of the harassment and failed to take prompt and effective remedial action.
Each Plaintiff must establish all of these elements. If any of the Plaintiffs does not prove any of the above elements by a preponderance of the evidence, your verdict must be for the Defendant with regard to that Plaintiff and you need not proceed further in considering that Plaintiff's claim.

J.A. at 393.

-16-

give an instruction that overemphasized certain evidence and could have misled the jury. 827 F.2d at 1231-32. These cases do not support Appellants' argument. Nothing in these cases suggests that a district court may not give examples to clarify instructions. Furthermore, the examples given by the district court in instruction number 18 do not unfairly comment on the evidence in this case. The examples are simply hypothetical examples for the purpose of clarity on what constitutes discriminatory changes in the terms and conditions of one's employment. Third, Appellants argue that the district court should have adopted their proposed instruction instead of instruction number 18. The district court was well within its discretion in using instruction number 18, which is supported by Eighth Circuit Model Instruction 5.42. Accordingly, we find no abuse of discretion by the district court with regard to instruction number 18.

### 4. Jury Instruction Number 22

Instruction number 22, entitled "Damages Period," provides:

> [e]ach Plaintiff may only recover damages on his race discrimination claim for <u>unlawful acts</u> occurring within the period listed on his Special Verdict Form. Evidence has been presented of acts that occurred outside of this period; however, such acts serve only to establish relevant background information. You may not award damages for any acts which occurred outside of the period listed on each Plaintiff's Special Verdict Form.

J.A. at 402 (emphasis added). Appellants argue that "unlawful acts" was never defined and misled the jury. We note that this instruction can only affect Webb, as the jury only reached the issue of damages in his case. In light of the jury instructions as a whole, we find that this term was not misleading. Accordingly, we find no abuse of discretion.

-17-

## C.	Damages Period

Third, Appellants argue that the district court inappropriately narrowed the damages period: (1) Appellants argue that the district court erred in limiting the damages period under MHRA to one year; and (2) Appellants argue that in light of the new rule for damages in National Railroad Passenger Corp. v. Morgan, 122 S. Ct. 2061 (2002), the district court incorrectly limited the damages period under Title VII. We must note initially that these arguments regarding the damages period only apply to Appellant Webb because the jury did not reach damages for any of the other Appellants. At trial, Webb contended that he should be able to recover damages for illegal acts occurring since the June 1994 settlement.[8] The special verdict form and instruction number 22, however, directed the jury to award damages for injuries Webb suffered between November 5, 1995, and the date of his retirement, May 31, 2001.

In Appellants' opening brief, they argued that the correct damages period under the MHRA would allow Appellants to recover under the continuing violation theory and thus allow consideration of otherwise time-barred acts as part of the continuing violation. The Appellants' argument with regard to the damages period under MHRA has merged into the argument regarding Morgan. The MHRA requires that all charges of discrimination be filed with the EEOC within one year of the alleged discrimination. See Minn. Stat. § 363.06.[9] The district court limited Webb's damages period to acts occurring within the one-year statute of limitations period. The district court justified the narrow damages period by noting first that there was no Minnesota case law on the issue, and second that the rationale for allowing damages to be

_____

[8]Although he was not a party to the settlement, Webb voluntarily limited his claims to post-settlement acts.

[9]Note that technically Webb's claim under Title VII would be subject to a 300-day limitation period, see 42 U.S.C. § 2000e-5(e)(1); however, the City stipulated to a one-year limitation period for all claims in order to simplify matters.

recovered only with respect to events that occurred within the limitations period under Title VII, under Madison v. IBP, Inc., 257 F.3d 780, 796-97 (8th Cir. 2001), vacated and remanded, 122 S. Ct. 2583 (2002), applied similarly to the MHRA. Under Eighth Circuit case law at the time of the district court's decision regarding the damages period, under Title VII, employees could only recover damages "for acts committed during the statute of limitations period, even if there was a continuing violation." Id. at 797. While this appeal was pending, the Supreme Court vacated Madison in light of its decision in Morgan. Thus, the correct damages period to be applied to Webb's claims depends on how Morgan affects this case. How the new rules handed down in Morgan affect Eighth Circuit precedent are questions of law and should be reviewed de novo. Wal-mart Stores, Inc. v. Crist, 855 F.2d 1326, 1330 n.4 (8th Cir. 1988).[10]

In Morgan, the Supreme Court held that "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." 122 S. Ct. at 2077. The question for liability as well as damages after Morgan is whether the acts complained of are part of the same unlawful employment practice. If so, then all of the acts may be considered so long

---

[10]We recognize that in Treanor v. MCI Telecommunications Corp., 200 F.3d 570 (8th Cir. 2000), this court stated that the MHRA's statute of limitations could be avoided by application of the continuing violation doctrine. However, that case relied on Giuliani v. Stuart Corp., 512 N.W.2d 589, 595 (Minn. Ct. App. 1994), which relied on Title VII case law in other circuits as supporting the continuing violation theory. Id. (citing Lane v. Ground Round, Inc., 775 F. Supp. 1219, 1224 (E.D. Mo. 1991) (discussing Title VII cases applying the continuing violation theory (citing Waltman v. Int'l Paper Co., 875 F.2d 468, 474 (5th Cir. 1989); Berry v. Bd. of Supervisors, 715 F.2d 971, 979 (5th Cir. 1983); Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 472 (D.C. Cir. 1976)))). Because our ruling in Treanor was based on case law altered by the Court's decision in Morgan, we think Morgan equally affects the vitality of the continuing violation doctrine as it applies to the MHRA.

as one of the acts falls within the limitations period. If not, then only the acts which fall in the limitations period may be considered.

The Supreme Court explained the difference between discrete discriminatory acts and a series of separate acts that together constitute an "unlawful employment practice," 42 U.S.C. § 2000e-5(e)(1). Id. at 2069-76. A discrete act "'occurred' on the day that it 'happened'" and constitutes its own unlawful employment practice. Id. at 2070. Examples of discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire." Id. at 2073. "Discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." Id. at 2071.

On the other hand, the Supreme Court opined that a hostile work environment claim typically involves a series of separate acts, which together constitute the unlawful employment practice. Id. at 2074. Because these acts are part of the same claim, the Court held that an employer may be liable for all of the acts, and in order for the claim to be timely, only one act in the series must have occurred within the limitations period. Id.

The Court explained that first "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice," and second the court must determine whether any act that is part of the same claim falls within the statutory time period. Id. at 2076.

In the case at bar, the jury found the City vicariously liable for the harassment against Webb. In order to find the City liable under Title VII and the MHRA,[11] the

---

[11]We look to Title VII case law to analyze both claims. See Hanenburg v. Principal Mut. Life Ins. Co., 118 F.3d 570, 574 (8th Cir. 1997) ("In analyzing cases under the MHRA, the state courts apply the principles developed in the adjudication of claims under Title VII because of the substantial similarities between the two statutes.") (citation omitted); Sigurdson v. Isanti County, 386 N.W.2d 715, 719

-20-

jury had to first find "unwelcome harassment based on race which is sufficiently severe or pervasive as to affect a term, condition, or privilege of employment." Bowen v. Mo. Dep't of Soc. Servs., 311 F.3d 878, 883 (8th Cir. 2002) (citation omitted). To the extent the racial harassment Webb complained of was committed by co-workers, the jury also had to find that the City knew or should have known about the harassment and failed to take effective remedial measures, or in other words, that the City was negligent. Id. The jury instructions reflected these elements. The only possible set of incidents for which the evidence supports a finding that these elements were met is the events that took place regarding McCardle and Webb and the City's response to these events. This is precisely what the jury found, as evidenced by the fact that for two of the four other B-shift Appellants, under the same set of facts as Webb, only without their own McCardle-type incident and response thereto, the jury found a hostile work environment, but that there was no harassment that occurred that the City failed to promptly and effectively remedy.

The McCardle incident, and the City's response thereto, involved a series of discrete events each constituting its own unlawful employment practice. Those occurring after November 5, 1995, and so within the damages period, include the reprimand of Webb for intimidating McCardle, the rejection of Webb's race harassment charge against McCardle, and the order to report for a fitness-for-duty exam. These discrete acts were properly before the jury under instruction number 22 and the special verdict form. Moreover, these discrete acts, under Morgan, cannot be used to revive pre-limitations acts for the purposes of recovering damages because they are separate and distinct unlawful employment practices. 122 S. Ct. at 2071-72 (explaining that "discrete acts that fall within the statutory period do not make timely acts that fall outside the time period" and "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed

---

(Minn. 1986).

charges"). Accordingly, we find that, even though the law and analysis have changed since <u>Morgan</u>, the district court applied the correct damages period.

## D. New Trial Motion

Finally, Appellants claim that the district court should have granted their motion for a new trial. We review the denial of a motion for a new trial for abuse of discretion. <u>Jones v. TEK Indus., Inc.</u>, 319 F.3d 355, 358 (8th Cir. 2003) (citation omitted). Grant of a motion for a new trial is only appropriate "if the verdict is against the great weight of the evidence and [] allowing it to stand would result in a miscarriage of justice." <u>Id.</u> (citation and internal quotation omitted).

Appellants claim that the district court abused its discretion because the jury's verdict was against the great weight of the evidence, warranting a new trial. Having thoroughly reviewed the record, we disagree and find no abuse of discretion in the denial of the new trial motion.

## III.

For the aforementioned reasons, we affirm.

HEANEY, Circuit Judge, dissenting.

I dissent from Section II.C. of the majority's opinion, which misinterprets and misapplies the damages analysis presented in <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 122 S.Ct. 2061 (2002). I would grant Appellants a new trial because the district court erred by narrowing Appellants' damages period for their claim under the Minnesota Human Rights Act (MHRA).

At trial, Appellants contended that they should be able to recover damages for all acts contributing to the hostile work environment that took place beginning in June of 1994 (the time the prior race discrimination suit was settled). The district court disagreed, and narrowed the damages period to one year under the MHRA. Thus, while the jury heard evidence of racially hostile acts occurring as far back as 1994, it could only award damages for a limited period for each plaintiff.[12] The district court based its ruling on Madison v. IBP, Inc., 257 F.3d 780, 796-97 (8th Cir. 2001), which held that plaintiffs may only recover damages on their hostile work environment claims for acts committed within the statute of limitations period, even if there were a continuing violation. This conflicts with the law as explained by the Supreme Court in Morgan.

In Morgan, the Court reaffirmed that claims are to be divided into two categories: those based on discrete discriminatory acts, and those based on a hostile work environment. Morgan, 122 S.Ct. at 2071-75. Discrete discriminatory acts include failing to promote, denial of a transfer, and refusing to hire. Id. at 2073. Because each of these acts could independently support a discrimination claim, the statute of limitations runs independently for each discrete act. Id. at 2071. In contrast, the Court held that because hostile work environment claims attack one continuing unlawful employment practice, the statute of limitations does not apply so strictly to these claims. Id. at 2075. Rather, a plaintiff alleging a hostile work environment can recover damages for acts occurring outside the statute of limitations, so long as any act contributing to the hostile environment occurred within the statutory period. Id. This, obviously, was at odds with our decision in Madison, and, consequently, also at odds with the framework used by the district court in this

---

[12]For Smith and Webb, the court limited the jury's consideration of damages to acts occurring since November 5, 1995; for Mems, damages were limited to acts occurring since April 15, 1996; Brown's statutory damages period was limited to acts occurring since April 16, 1996; and Khaliq's damages period was limited to act occurring since April 22, 1996.

-23-

matter. See Madison v. IBP, Inc., 536 U.S. 919 (June 17, 2002) (mem.) (granting certiorari, vacating judgment, and remanding for further consideration in light of Morgan).

The majority recognizes that the district court used the wrong legal analysis, yet holds Appellants are not entitled to relief. In so doing, the majority posits that our analysis should be limited to Webb because he was the only plaintiff to recover damages. This is simply incorrect. Morgan, in fact, announced the opposite proposition: the plaintiff *need not* prove damages occurred within the statutory period so long as any act contributing to the hostile work environment did. See Morgan, 122 S.Ct. at 2073 ("The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."). Our circuit has, until now, interpreted Morgan accordingly. See Jensen v. Henderson, 315 F.3d 854, 859 (8th Cir. 2002) ("Only the smallest portion of that [unlawful employment] 'practice' needs to occur within the limitations period for the claim to be timely."). The majority diverges from that beaten path. By holding that a hostile work environment plaintiff must prove damages within the statutory period before a jury can consider acts beyond the statutory period, essentially returns our circuit to its position in Madison, a framework squarely rejected by the Supreme Court.

As illustrated above, the proper question is not whether Appellants proved *damages* from conduct within the statutory period, but rather whether *any act* contributing to the allegedly hostile work environment took place within the statutory period. Clearly, each of these plaintiffs produced such evidence: Smith was the subject of what he contends was an unreasonable search of his locker and belongings due to his race in 1996, and the B shift firefighters – Mems, Brown, Webb, and Khaliq – presented evidence that they were victims of a plethora of racially-motivated acts, all of which occurred within each's respective statutory limitation period.

Each of the plaintiffs satisfied <u>Morgan</u>'s threshold requirement of alleging some act contributing to the hostile work environment that is not time-barred. Accordingly, each of the plaintiffs was the victim of trial court error when the court limited their respective damages periods. This error prevented the jury from fully considering numerous acts that occurred in 1994, 1995, and, for some of the plaintiffs, in 1996. Obviously, consideration of these acts may have changed the jury's mind. I therefore believe a new trial is appropriate for all Appellants, with the district court employing the analysis put forth by the Supreme Court in <u>Morgan</u>.

Even if the majority's position were to stand, its analysis with regard to Webb is flawed. The majority suggests that the district court properly limited the damages period for Webb because all of the acts that Webb alleged to have happened within the statutory period were discrete acts rather than part of a hostile work environment. <u>See</u> <u>Ante</u> at 21 ("[T]hese discrete acts, under <u>Morgan</u>, cannot be used to revive pre-limitations acts for the purpose of recovering damages because they are separate and distinct unlawful employment practices." (citing <u>Morgan</u>, 122 S.Ct. at 2071-72)).

While it may be that Webb's reprimand and the rejection of Webb's discrimination claim were discrete acts of discrimination, <u>see</u> <u>Morgan</u>, 122 S.Ct. at 2073 (noting discrete discriminatory acts include failing to promote, denial of a transfer, refusing to hire), the majority overlooks the other acts complained of by the B shift firefighters: racially offensive cartoons and magazines left at the station; vandalism of B shift amenities at the station; and the loosening of Webb's vehicle lug nuts while he was at work, to name a few. All of these acts happened within the statutory limitations period. Clearly, these are not independently actionable discrete acts, but rather are acts contributing to Webb's claim that he, along with other B shifters, was subjected to a racially hostile work environment. Thus, the majority has not only misinterpreted <u>Morgan</u>, it has misapplied its own analysis to plaintiff Webb. Accordingly, I dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.